**EMPLOYMENT SECURITY COMMISSION OF WYOMING, Appellant (Respondent),**

v.

**WESTERN GAS PROCESSORS, LTD., Appellee (Petitioner).**

No. 89–175.

Supreme Court of Wyoming.

Feb. 1, 1990.

Joseph B. Meyer, Atty. Gen. and William G. Hibbler, Sp. Asst. Atty. Gen., for appellant.

Robert G. Pickering of Bailey, Pickering & Stock, Cheyenne, for appellee.

Before CARDINE, C.J., and THOMAS, URBIGKIT, MACY and GOLDEN, JJ.

URBIGKIT, Justice.

This is a misconduct, drug test, employment termination case. Appellant Employment Security Commission of Wyoming (ESC) appeals from a district court reversal

of its unemployment compensation benefit determination favoring the employee.

ESC contends the determination was properly based upon findings of fact supported by substantial evidence and upon conclusions of law which are in accordance with law. ESC granted unemployment insurance benefits to employee Donald B. Wilson (Wilson)· pursuant to W.S. § 27–3–311(c) (1989 Cum.Supp.)[1] after determining his resignation from employer Western Gas Processors, Ltd. (Western), appellee, was forced and equivalent to discharge. Wilson was allowed unemployment benefits because his discharge was not for misconduct connected with his work because he "did not commit misconduct * * * by simply refusing to submit to an unreasonable demand by his employer." By holding ESC's determinations factually sustainable and justified within proper con-

clusions of law, we reverse the district court reversal of the agency award.

### FACTS[2]

Wilson was employed at Western late in 1985 to be a "Field Operations Maintenance" worker (handyman mechanic). When he was hired, there was no corporate policy indicating employees would be subject to any blood or urine tests for illegal drugs or legalized abused intoxicants to ensure the safety of the workplace; nor was there a policy which indicated employees would be subject to such testing when there was a particularized suspicion of improper use.[3] Soon after Wilson began work, his supervisor, Mike Keil, recognized Wilson had difficulty with mathematics and computer usage. In December of 1987,

---

1. W.S. 27–3–311(c) (emphasis added) provides: "An individual shall be disqualified from benefit entitlement and shall forfeit all accrued benefits if he was discharged from his most recent work for *misconduct connected with his work,* fraud in connection with a claim for benefits or receipt of disqualifying income." In application of the statute, ESC adopted a generally utilized definition:

   " 'Misconduct under the Wyoming Employment Security Law means generally an act of an employee which indicates a disregard of (1) the employer's interests or (2) the commonly accepted duties, obligations and responsibilities of an employee. This would include carelessness or negligence of such degree or recurrence as to reveal willful intent or an intentional disregard of the employer's interests or of the employee's duties and obligations to his employer. Inefficiency or failure in good performance as the result of inability or incapacity; ordinary negligence in isolated instances or good faith errors in judgment or discretion are not deemed to be misconduct within the meaning of the Law.' " *Safety Medical Services, Inc. v. Emp. Sec. Com'n of Wyoming,* 724 P.2d 468, 472 (Wyo.1986).

2. This is a fact sensitive and highly unusual occurrence involving an employer, which has neither a policy nor history of requiring random drug testing, requesting an unexpected test immediately after the employee had returned from an extended vacation. For comparison, see *Grace Drilling Co. v. Board of Review of Indus. Com'n of Utah,* 776 P.2d 63 (Utah App. 1989), where a company policy existed and a written consent was used. *See also City of Palm Bay v. Bauman,* 475 So.2d 1322 (Fla.App.1985), where an adopted policy was the litigative subject and *Luedtke v. Nabors Alaska Drilling, Inc.,*

768 P.2d 1123 (Alaska 1989), where both a policy and individual specific advance notice was considered as an employment termination proceeding. *See also Fremont Hotel & Casino v. Esposito,* 760 P.2d 122 (Nev.1988) and *Texas Employment Commission v. Hughes Drilling Fluids,* 746 S.W.2d 796 (Tex.App.1988). Likewise, see *Clevenger v. Nevada Employment Sec. Dept.,* 770 P.2d 866 (Nev.1989), where both a policy and history existed. Distinguishable also is a complaint history for law enforcement public employment, *Fowler v. Unemployment Appeals Com'n,* 537 So.2d 162 (Fla.App.1989). In that case, no issue of reasonable suspicion of drug taking was raised.

   A singular anomaly is provided in present American society. *See Harmon v. Thornburgh,* 878 F.2d 484 (D.C.Cir.1989), *cert. denied* —— U.S. ——, 110 S.Ct. 865, 107 L.Ed.2d 949 (1990), where a federal appeals court "upheld an injunction against random drug testing of federal prosecutors in criminal cases and employees with access to grand jury proceedings." National District Attorneys Association, *Case Commentaries and Briefs,* at 2 (1990). The injunction was modified "to permit the testing of Department of Justice employees holding 'top secret national security' clearances." *Id.* at 2. Certiorari was requested by the excluded employees but not by the enjoined agency and, on that basis, was denied by the United States Supreme Court.

3. Nor was any general company substance test policy established during his employment. ESC accurately found that until the test request, "[t]he employer did not previously make such random testing a condition of the claimant's employment."

however, Keil noted in a performance report that "Don has a high sense of safety awareness and knowledge. His behavior towards safety and team mates is an asset to the Newcastle Plant and the company. He has a good attitude towards the company and is trying to increase his job knowledge."

On June 17, 1988, the employee began a four week vacation and was due back on July 15. Two weeks before his return, co-employee Donald Schaff went to Keil to allege Wilson smoked marijuana on the job. This fellow worker reported he had occasionally smelled the scent of marijuana [4] on Wilson, that the co-worker "would get very uptight when he was faced with a problem or a subject that concerned him" and his eyes were sometimes reddish.[5] Schaff was the only fellow employee to make this allegation. The supervisor was aware the relation between these two workers was not friendly. Based on the unilateral and uncorroborated allegation of marijuana use, Keil then notified his supervisor of the Schaff report.

On the first morning back to work following his vacation, Wilson was directed to take a company truck from Newcastle to Gillette (seventy-six miles distance) to pick up a fire extinguisher, get the truck's radio fixed, and meet with Keil at the company's Gillette office at one o'clock. On arriving at the office, the employee was handed a surprise (Dear John) letter signed by his supervisor. The pertinent parts of the letter read:

> I am concerned about the state of your health and require you, as a condition of employment, to submit to a general physical examination, at Company expense, including an eye exam and blood and urine tests, which will involve among other things tests for illegal drugs.
>
> Your physical examination is scheduled for Friday, July 15, 1988, at 2:00 P.M. with Dr. Naramore in Gillette.
>
> Your safety, the safety of others and the safe operation of the gas processing equipment are primary concerns.
>
> According to Company Policy if the blood or urine test results are positive for illegal drugs, you will be discharged immediately.[6] Until the tests results are known (three to five days) you will be on leave with pay and you are not to enter plant property for any reason.
>
> If your blood/urine tests are negative and no other physical impairment is found, you must take immediate action to improve your performance and maintain an improved performance level. We can work together to meet this goal.

With this totally unexpected written notice, Wilson was given three options. He could submit to the physical and return to work in several days if the tests were negative; he could refuse the physical and Western would terminate him on the spot; or he could quit. Wilson did quit and asked if he should call his wife to drive to Gillette to pick him up to which the response was given that he could drive the company truck back the seventy-six miles to Newcastle and finish out the day at work.

On July 25, the ex-employee filed a claim for unemployment benefits. The initial determination by ESC allowed Wilson unemployment benefits and held Western's account chargeable with its proportionate share of benefits which might be paid. The

---

4. Schaff admitted during his testimony to a hearing examiner that he had been "real familiar" with marijuana and so was able to identify the scent.

5. During his testimony with the hearing examiner, Wilson indicated he was allergic to over 273 different items including hay, sagebrush, cat hair, etc. He also denied any use of marijuana.

6. If safety concerns motivated Western, it remains unexplained why this one employee would be terminated for signs of illegal drug use but not signs of alcohol use. Legal and illegal drug use seemed of equal safety concern before the regulations contested in *Skinner v. Railway Labor Executives Ass'n.,* —— U.S. ——, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) were promulgated. "In view of the *obvious safety hazards of* drug and *alcohol use* by railroad employees, the Agency announced in June 1984 its intention to promulgate federal regulations on the subject." *Id.* 109 S.Ct. at 1408 (emphasis added). "23% of the operating personnel were *'problem drinkers.'* " *Id.* at 1407 n. 1 (emphasis added). The timed relationship of demanded test to a return from vacation is obvious and was recognized by the administrative agency.

employer protested but the determination was upheld in the redetermination by the Chief of Benefits to ESC who stated "[a]vailable facts indicate that the claimant [Wilson] was to be replaced regardless of the test results." The employer appealed to an appeals examiner. That hearing examiner reversed the redetermination after deciding the employee should be disqualified from benefits because he resigned without good cause connected with his work. That decision was reversed by ESC by determination that Wilson did not commit misconduct when he refused to submit to the drug test because the demand was unreasonable under the circumstances. The appeal by Western to the district court claimed ESC's findings of fact were arbitrary, capricious, and an abuse of discretion because they were not supported by substantial evidence and the conclusions of law were wrong. The district court accepted the appeal contention and ESC now appeals.

## STANDARD OF REVIEW

The standard of review of an agency determination is well-established. Unemployment benefit cases involving contended misconduct normally present mixed questions of law and fact. *Henson v. Employment Sec. Dept. of State*, 113 Wash.2d 374, 779 P.2d 715 (1989). See generally *Natrona County School Dist. No. 1 v. McKnight*, 764 P.2d 1039 (Wyo.1988). A reviewing court is "confined to the matters explicitly referenced in W.S. 16–3–114(c)

and W.R.A.P. 12.09." [7] *Cook v. Zoning Bd. of Adjustment for the City of Laramie*, 776 P.2d 181, 184 (Wyo.1989).

On appeal from a district court's consideration of an agency action, this court is not bound by the conclusions of the reviewing court. Rather, using the same evidentiary materials and the same review standards as the district court, we conduct an independent inquiry into the matter, just as if it had proceeded directly to us from the agency. *Southwest Wyoming Rehabilitation Center v. Emp. Sec. Com'n. of Wyoming*, 781 P.2d 918, 920 (Wyo.1989). (*Accord Employment Sec. Com'n of Wyoming v. Bryant*, 704 P.2d 1311, 1314 (Wyo.1985) and *Matter of North Laramie Land Co.*, 605 P.2d 367, 373 (Wyo.1980).) Our deference for findings of fact is reserved for the fact-finder which, in this case, is ESC. *Department of Revenue and Taxation of State of Wyoming v. Casper Legion Baseball Club, Inc.*, 767 P.2d 608 (Wyo.1989). See *Zezas Ranch, Inc. v. Board of Control*, 714 P.2d 759, 764 (Wyo.1986).

When reviewing a claim that an agency determination is arbitrary, capricious, and an abuse of discretion because the findings of facts are not supported by substantial evidence, we determine if there is "such relevant evidence as reasonable minds would accept as adequate to support a conclusion." *Southwest Wyoming Rehabilitation Center*, 781 P.2d at 921. (*Accord Beddow v. Employment Sec. Com'n.*

---

7. W.S. 16–3–114(c) provides:
   To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:
   (i) Compel agency action unlawfully withheld or unreasonably delayed; and
   (ii) Hold unlawful and set aside agency action, findings and conclusions found to be:
   (A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

(B) Contrary to constitutional right, power, privilege or immunity;
(C) In excess of statutory jurisdiction, authority or limitations or lacking statutory right;
(D) Without observance of procedure required by law; or
(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.
W.R.A.P. 12.09 provides in relevant part:
   The review shall be conducted by the court without a jury and shall be confined to the record as supplemented pursuant to Rule 12.-08, W.R.A.P. and to the issues raised before the agency. The court's review shall be limited to a determination of the matters specified in § 16–3–114(c).

*of Wyoming,* 718 P.2d 12, 14 (Wyo.1986).) Our review of an agency's findings of fact and conclusions of law is simple. First, if we can find from the evidence preserved in the record a rational view for the findings of fact made by the agency, we then say the findings are supported by substantial evidence. *See Holdings' Little America v. Board of County Com'rs. of Laramie County,* 670 P.2d 699, 704 (Wyo.1983). Using judicial reliance upon and deference to agency expertise in its weighing of the evidence, a reviewing court will not disturb the agency determination unless it is "clearly contrary to the overwhelming weight of the evidence on record." *Southwest Wyoming Rehabilitation Center,* 781 P.2d at 921. (*Accord Cody Gas Co. v. Public Service Com'n of Wyoming,* 748 P.2d 1144, 1146 (Wyo.1988).) *See Ohlmaier v. Industrial Com'n of Arizona,* 161 Ariz. 113, 776 P.2d 791 (1989). See also for a drug test unemployment compensation award review, *Grace Drilling Co. v. Board of Review of Indus. Com'n of Utah,* 776 P.2d 63 (Utah.App.1989). Second, we ask if the conclusions of law made by the agency are in accordance with law. *Belle Fourche Pipeline Co. v. State,* 766 P.2d 537 (Wyo. 1988).

■ When we review agency conclusions of law, we are alert to three possibilities. The agency may correctly apply their findings of fact to the correct rule of law. *Belle Fourche Pipeline Co.,* 766 P.2d 537. In such case, the agency's conclusions are affirmed. But the agency could apply their findings of fact to the wrong rule of law or they could incorrectly apply their findings of fact to a correct rule of law. *Ballard v. Wyoming Pari–Mutuel Com'n of State of Wyoming,* 750 P.2d 286 (Wyo.1988). In either case, we correct an agency conclusion to ensure accordance with law. *Rocky Mountain Oil & Gas Ass'n v. State Board of Equalization,* 749 P.2d 221 (Wyo.1987).

Our standard of review for any conclusion of law is straightforward. If the conclusion of law is in accordance with law, it is affirmed, *Casper Legion Baseball Club, Inc.,* 766 P.2d 608; if it is not, it is to be corrected, *Rocky Mountain Oil & Gas Ass'n,* 749 P.2d 221.[8]

## ANALYSIS

The issue before this court is narrow. Our review is limited to determining whether ESC's determinations that Wilson was constructively discharged and to allow him unemployment benefits under W.S. 27–3–311(c) because he "did not commit misconduct * * * by simply refusing to submit to an unreasonable demand by his employer" are based on findings of fact supported by substantial evidence and are in accordance with law. Our understanding of ESC's determinations and our standard of review creates a three-fold inquiry. Could ESC determine that Wilson's resignation was equivalent to discharge? Could ESC determine that the demand was unreasonable? Could ESC determine, if the demand was unreasonable, that it was not misconduct connected with work to refuse such a demand?

■ ESC concluded that the employer's demand to the employee that he yield up a sample of his urine to their corporate physician for analysis or resign on the spot was unreasonable and the resulting resignation constituted a constructive discharge. We find there was sufficient evidence in the record to support the findings of fact necessary to an appropriate conclusion of law that Wilson had been constructively discharged. "Where an employee resigns due to the reasonable belief that his discharge is imminent, his resignation cannot properly be termed 'voluntary' * * *." *Scannevin v. Director of Division of Employment Security,* 396 Mass 1010, 487 N.E.2d 203, 205 (1986). (*Accord Malone–Campagna v.*

---

**8.** A valuable analysis of Wyoming administrative law is provided in Battle, *Administrative Law, Wyoming Style,* XVIII Land & Water L.Rev. 223 (1983). *See also* Note, *ADMINISTRATIVE LAW—The Scope of Judicial Review of Administrative Actions, Laramie River Conservation Council and Powder River Basin Resource*

*Council v. Industrial Siting Council of the State of Wyoming and Basin Electric Power Cooperative, 588 P.2d 1241 (Wyo.1978),* XIV Land & Water L.Rev. 607 (1979) and Bloomenthal, *Administrative Law in Wyoming—An Introduction and Preliminary Report,* 16 Wyo. L.J. 191 (1962).

*Director of the Div. of Employment Sec.,* 391 Mass. 399, 461 N.E.2d 818 (1984).) *See Green v. District of Columbia Dept. of Employment Services,* 499 A.2d 870, 877 (D.C.App.1985). Western was quite matter of fact when it admitted Wilson was told his discharge was imminent if he refused to submit immediately to a urine test. We hold that ESC could determine that the resignation was equivalent to discharge.

We also hold ESC could conclude the demand was unreasonable. ESC found the demand unreasonable for three reasons. The request was unreasonable as an "invasion of his [Wilson's] privacy and a violation of other guaranteed constitutional rights." Second, there was no established policy at the time Wilson was hired or later adopted which required, as a condition of the employment, any submission to either random testing for intoxicants or such testing based upon a reasonable and particularized suspicion. Third, the uncorroborated allegations of a hostile co-employee did not form the basis of a reasonable suspicion had such a policy been in place.[9]

While we regard highly the federal constitutional guarantees to privacy [10] as well as the right to privacy in Wyoming,[11] it is

9. The Washington court has enunciated a three-part test to establish disqualifying misconduct in unemployment compensation cases from on-duty cases and a differentiated standard for off-duty conduct disqualification.

"[W]here the conduct or activities for which the claimant is discharged occurred off the working premises and outside the course and scope of employment, the employer must, in order to show that the conduct is work-connected, point to some breach of a rule or regulation that has a reasonable relation to the conduct of the employer's business."

*Nelson v. Department of Employment Sec.,* 98 Wash.2d 370, 655 P.2d 242, 244 (1982) (quoting *Giese v. Employment Division,* 27 Or.App. 929, 935, 557 P.2d 1354 (1976)). The rule for on-duty conduct is stated:

In *Macey v. Department of Empl. Sec., supra* [110 Wash.2d 308, 752 P.2d 372 (1988) ], we formulated the following three-part test to establish disqualifying misconduct: (1) the employer's rule must be reasonable under the circumstances; (2) the conduct of the employee must be connected with the work; and (3) the conduct of the employee must in fact violate the rule. *Macey,* 110 Wash.2d at 319, 752 P.2d 372.

The *Macey* test, however, applies only to on-duty misconduct, as opposed to the off-duty test established in *Nelson v. Department of Empl. Sec.,* 98 Wash.2d 370, 375, 655 P.2d 242 (1982).

*Henson,* 779 P.2d at 717.

In this case, we lack both an established rule and determinable history for any immediate drug testing practice. The absence of an established employer rule makes application of either the on-duty or off-duty standard difficult here. *Cf. Roberts v. Employment Security Commission of Wyoming,* 745 P.2d 1355 (Wyo.1987).

10. "The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the significance of man's spiritual nature, of his feelings and of his intellect. They knew that only a part of the pain, pleasure and satisfaction of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the government, *the right to be left alone—the most comprehensive of rights and the right most valued by civilized men.*"

*Olmstead v. United States,* 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944, 956 (1928) (Brandeis, J., dissenting) (emphasis added). "All of these aspects of the right of privacy are rights 'retained by the people' in the meaning of the Ninth Amendment." *Roe v. Wade,* 410 U.S. 179, 93 S.Ct. 756, 757, 35 L.Ed.2d 147 (1973) (Douglas, J., concurring) (emphasis added). The Reserved Rights Clause (Ninth Amendment) was "proffered to quiet expressed fears that a bill of specifically enumerated rights could not be sufficiently broad to cover all essential rights and that the specific mention of certain rights would be interpreted as a denial that others were protected." *Griswold v. State of Connecticut,* 381 U.S. 479, 488–89, 85 S.Ct. 1678, 1684, 14 L.Ed.2d 510 (1965) (Goldberg, J., concurring and footnote omitted). *See Boyd v. United States,* 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746 (1886).

For current literature, see Simpson, *Does a "Drug–Free Federal Workplace" Also Mean a "Fourth Amendment Free Workplace"?,* 40 Labor L.J. 547 (1989); Note, *Alternative Challenges to Drug Testing of Government Employees: Options After Von Raab and Skinner,* 58 Geo. Wash. L.Rev. 148 (1989); Note, *Drug Testing in the Workplace: Sacrificing Fundamental Rights in the War on Drugs?,* 91 W.Va. L.Rev. 1969 (1989); and Note, *Drug Testing of Public and Private Employees in Alaska,* V Alaska L.Rev. 133 (1988).

11. *Scadden v. State,* 732 P.2d 1036, 1040 (Wyo. 1987); *Arnold v. Mountain West Farm Bureau Mut. Ins. Co., Inc.,* 707 P.2d 161, 165 (Wyo.1985) (citing *Thomas v. Harrison,* 634 P.2d 328, 334 (Wyo.1981)). *See Beardsley v. Wierdsma,* 650 P.2d 288, 295 (Wyo.1982). *See also* Wyo. Const. art. 1, § 36 (Reserved Rights Clause).

not necessary to address the constitutional rights relied upon by ESC to affirm its determinations. Where constitutional difficulties can be avoided legitimately, this court will do so. *See Nowack v. State*, 774 P.2d 561, 565 (Wyo.1989) and *Frisby v. Schultz*, 487 U.S. 474, 108 S.Ct. 2495, 2501, 101 L.Ed.2d 420 (1988).

We affirm ESC's determination that the demand was unreasonable on more narrow grounds. The demand was unreasonable because there was no corporate policy either existent at the time Wilson was hired or later regularly adopted and adequately circulated which established the submission to either random testing for intoxicants or such testing based upon a reasonable and particularized suspicion to be a general condition for company employment. Nor, had such a policy been in place, are the uncorroborated allegations from a hostile co-employee the basis from which to make a reasonable demand because of a particularized suspicion. The standard of conduct required by the employer must be reasonable before refusal to abide by that standard becomes misconduct. *See* 81 C.J.S. *Social Security* § 222(b) (1977), entitled What Constitutes Willful Misconduct.

■ This conclusion implicitly rejects Western's claim that their handbook inclusion of "[s]erious misconduct of any kind, including being under the influence of alcohol or illegal drugs, fighting * * *, etc." "confers implied consent to investigate through drug testing the existence of such drugs in the body" as Western argued. ESC may have eyed the fact that Wilson had signed the Acknowledgement of Receipt of the WGP Company Employee Handbook which stated "[t]he contents of this handbook do not constitute an express or implied contract of employment." Such a disclaimer works for both parties, not just Western. ESC could rightly disregard Western's argument of implied consent. ESC concluded a unilateral change in the condition of employment was unreasonable and that the uncorroborated allegations

from a co-employee with a demonstrated record of hostility toward Wilson cannot form the basis of a reasonable demand. We agree. "[T]here was no condition in the application for employment or the contract of employment to" provide urine samples. *Valley Vendors, Inc. v. Jamieson*, 129 Ariz. 238, 630 P.2d 61, 64 (1981). This was apparently the first occurrence and there was not even a general company practice. *Safety Medical Services, Inc. v. Emp. Sec. Com'n of Wyoming*, 724 P.2d 468 (Wyo.1986).

■ Accepting ESC's determination that the demand was unreasonable, we review ESC's legal determination that employee misconduct did not occur with refusal of the demand. In *Safety Medical Services, Inc.*, 724 P.2d at 473 and *Roberts v. Employment Security Commission of Wyoming*, 745 P.2d 1355, 1358 (Wyo.1987), this court addressed employee misconduct. Essential to employee misconduct is a " 'disregard of * * * standards of behavior which the employer has the right to expect of his employee * * *.' " *Safety Medical Services, Inc.*, 724 P.2d at 473 (quoting *Boynton Cab Company v. Neubeck*, 237 Wis. 249, 296 N.W. 636, 639 (1941)). Because Western had no right to expect Wilson to submit to the test, related obviously to his return from vacation, newly created to be a condition of continued employment, there was, under these circumstances, no misconduct at work by test refusal.[12]

Reversed and remanded for entry of an order to sustain the administrative agency.

---

12. We do not determine whether the employer had a right to discharge without resulting contractual liability. This case only examines eligibility for unemployment benefits after constructive termination.