CASPER IRON & METAL, INC., Appellant (Appellant below),

v.

UNEMPLOYMENT INSURANCE COMMISSION OF the DEPARTMENT OF EMPLOYMENT OF THE STATE OF WYOMING; and Mark A. O'Brien, Appellees (Appellees below).

No. 92–39.

Supreme Court of Wyoming.

Jan. 11, 1993.

Peter J. Young and Harry B. Durham, III, of Brown & Drew, Casper, for appellant.

William G. Hibbler, Sr. Asst. Atty. Gen., for appellee Unemployment Ins. Comm'n.

Before MACY, C.J., and THOMAS, CARDINE, and GOLDEN, JJ., and URBIGKIT, J. Ret.*

CARDINE, Justice.

Casper Iron and Metal, Incorporated (CIM) brings this appeal of an administrative decision affirming payment of unemployment benefits to a former employee. Finding that the decision of the Unemployment Insurance Commission of the Department of Employment of the State of Wyoming (Commission) correctly determined the ultimate fact question, we affirm.

Two issues are presented by CIM:

I. Whether the Special Hearing Examiner for the Department of Employment, Division of Unemployment Insurance, improperly placed the burden of proving the voluntariness of Mark O'Brien's separation of employment on the employer, Casper Iron & Metal, Inc.

II. Whether the Special Hearing Examiner for the Department of Employment, Division of Unemployment Insurance, improperly used the wrong statutory standard to determine whether the employee, Mark O'Brien, was entitled to unemployment benefits.

The Commission restates the issues:

I. Whether the appeals examiner of appellee, Wyoming Department of Employment, Division of Unemployment Insurance, Unemployment Insurance Commission, properly allocated burdens of proof to the parties at the evidentiary hearing held in this matter?

II. Whether the appellee, Wyoming Department of Employment, Division of Unemployment Insurance, Unemployment Insurance Commission, properly held that Mark A. O'Brien is eligible for unemployment insurance benefits because he did not voluntarily quit his work but was discharged, however not for misconduct connected with that work?

FACTS

Claiming he was fired from his position as a crane operator and recyclable materials processor at CIM, Mark A. O'Brien (O'Brien) sought unemployment insurance. A commission deputy (Deputy) determined that O'Brien's claim was "not disqualified" and the cost of benefits would be charged against CIM's account. CIM appealed the determination arguing that O'Brien had voluntarily quit on April 24, 1991. CIM and O'Brien participated in an appeal hearing held to determine the "reason for claimant's separation from employment."

At the hearing, CIM pointed to a series of events to prove O'Brien quit his job voluntarily. After learning that CIM fired a temporary employee, O'Brien announced, on April 22, 1991, he was quitting and wanted his paycheck immediately. CIM President Sidney Tolin successfully talked O'Brien out of quitting. Sidney Tolin assured O'Brien that his job was not threatened. Two days later, on Wednesday, April 24, 1991, O'Brien reported to work for a short time and then left the job site at 8:45 a.m. Two co-workers reported to CIM management that O'Brien had quit. O'Brien, however, never stated such an intention to management. Sidney Tolin discussed O'Brien's absence with Vice-President, General Manager and Corporate Counsel Don Tolin. CIM management concluded O'Brien had quit and removed his time card from the office area.

O'Brien maintained at the hearing that he did not quit but was fired. Before leaving work on April 24, 1991, O'Brien completed a CIM "Employee Time-Off" form. The form indicated O'Brien's absence from work to meet with the "Laber Bord" (sic).

* Chief Justice at time of conference; retired January 1, 1993.

Lorna Wilkes (Wilkes), of the Wyoming Department of Labor, testified she met with O'Brien on the morning of April 24, 1991. Wilkes said O'Brien expressed concern about hazardous materials at CIM, including asbestos and lead, and possible retaliation for reporting the problems.

On his return to CIM, O'Brien completed another "Employee Time–Off" form showing he was absent from 8:46 a.m. to 12:00 noon to meet with the Labor Board. After completing the form, O'Brien asked where his time card was located. Sidney Tolin told O'Brien he had quit and his time card had been "pulled." According to Sidney Tolin, O'Brien erupted, screaming, "Fuck you, Mr. Tolin," several times and threatening, "If you were twenty years younger I'll [sic] take you on." O'Brien admitted losing his temper, but claimed it was after Sidney Tolin called O'Brien a "lying son-of-a-bitch" and ordered O'Brien to "get the fuck off my property." Sidney Tolin testified he did not "cuss and swear" at anybody and called O'Brien's accusation "a damned lie." [1] The shouting match ended when a Casper police officer escorted O'Brien off the premises.

Oh that word, spoken in the transience of the moment, its effect decays quietly. Written, it assumes the importance of time as if harkening back to the cuneiform wedges. But fortunately our tablets of stone and their permanence have been replaced by a recyclable medium, paper. With that simple change, intransigence can be replaced by decision. The language used by the participants is "crude"; it is also the language of exasperation, language which one less restrained might invoke in a shocking situation such as job loss. We are not here to excuse its use at the time. Our task is simply considering whether its recitation should be included in this opinion in light of a concern expressed by one member of the court.

The express language used by the parties is included as necessary to understanding the decision of the hearing officer

awarding benefits. The most important words were those not spoken. The management never said, "you're fired," to the employee. The employee never said, "I quit," to management. So the hearing examiner was left to examine the available testimony to determine, first, the intent of the employee in leaving the jobsite; second, at what point a termination did occur, if one occurred; and third, what evidence supported such a finding.

Management presented two affidavits signed by co-employees indicating the employee told them he quit. Refuting this testimony, the employee presented the two "time-out" forms he completed in accord with company policy to establish his intent to leave the jobsite temporarily. The action of "pulling" the employee's time card amounted to termination according to the hearing examiner. The virulence of the employee's reaction to learning his time card was missing and the reported statements of management offered persuasive support of the employee's position. The fact the employee had to be escorted by police off the jobsite after the management ordered him to leave also argues in favor of termination. Weighing *all* this evidence, the examiner determined a termination had occurred.

The language used is quoted. It was transcribed as stated in the administrative hearing. The language, therefore, comes from an official proceeding. The district court, undoubtedly, heard this language in its consideration of this action. It was also stated in briefing to this court as a relevant characterization of intent. Absent this important evidence of the language used, the reader of the opinion might have difficulty understanding the decision awarding benefits. Despite my brother's belief, the courts of Wyoming are already familiar with the profane words. *See F.C.C. v. Pacifica Foundation,* 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978).

Based on the evidence, the Commission's "Appeals Examiner" (Examiner) affirmed

1. Justice Thomas has objected to the quoted language and may file a specially concurring opinion.

the Deputy's initial decision that O'Brien was entitled to unemployment insurance. The Examiner determined O'Brien intended his absence from work to be only temporary. "The employer's action in 'pulling his time card' is an action which is commonly construed as a discharge."

The Commission adopted the Examiner's findings and conclusions and affirmed the decision. After administrative remedies were exhausted, CIM appealed to the district court. The district judge noted, in his decision letter, that there was evidence indicating O'Brien was fired and contrary evidence indicating he quit. Deferring to the agency's role as fact finder, the district court affirmed the Commission's decision.

## DISCUSSION

The issues of this case are really about language, some legal and some coarse. Initially, the language of the judicial function is overlaid with the language of administrative procedure to ask whether a contested case proceeding should be analogized to a trial or an appeal and, depending on the result, which party assumes the burden of proof, also defined by the separate burdens of production and persuasion. *See*, Bernard Schwartz, *Administrative Law*, § 7.8 (2nd ed. 1984). Ultimately, the language of the bureaucracy is pitted against the language of the laborer. One translation inquires whether a claimant is "not disqualified" for unemployment insurance discharge benefits. The second translation asks whether a worker quits by leaving the premises or gets fired when a time card is pulled and the worker is told to get off the property. In this mix of language, the Examiner applied the basic facts found from the evidence presented at the hearing to the law, producing the ultimate fact determination that O'Brien was entitled to benefits.

Our standard of review for administrative actions requires proper notice of jurisdiction. "The right to judicial review of administrative decisions is entirely statutory, and agency actions are not reviewable absent statutory authority." *Sellers v. Employment Sec. Comm'n*, 760 P.2d 394,

395 (Wyo.1988). Jurisdiction for judicial review of Commission decisions is granted by the Wyoming Employment Security Law, W.S. 27-3-101 through -704 (1991) (hereinafter WESL), which provides:

(a) Any person aggrieved or adversely affected by a final decision under this act may obtain judicial review by filing a petition for review with the district court of jurisdiction. Review by the court shall be as provided by the Wyoming Administrative Procedure Act [§§ 16-3-101 through 16-3-115] and shall be given precedence over all other civil cases except those under the Wyoming Worker's Compensation Act.

(b) A decision of the district court may be appealed to the supreme court. The appeal shall be taken in the same manner as other civil cases.

W.S. 27-3-407 (1991); *see also* W.R.A.P. 12.11.

Under the statutory jurisdiction grant, the Wyoming Administrative Procedure Act, W.S. 16-3-101 through -115 (1990) (hereinafter WAPA), directs the scope of review:

(c) To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:

(i) Compel agency action unlawfully withheld or unreasonably delayed; and

(ii) Hold unlawful and set aside agency action, findings and conclusions found to be:

(A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

(B) Contrary to constitutional right, power, privilege or immunity;

(C) In excess of statutory jurisdiction, authority or limitations or lacking statutory right;

(D) Without observance of procedure required by law; or

(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.

W.S. 16–3–114(c) (1990).

■ We review the agency decision without according any special deference to the district court decision. *Union Pacific R.R. Co. v. Wyoming State Bd. of Equalization,* 802 P.2d 856, 859 (Wyo.1990). Using the same evidence and same review standards as the district court, the review conducted by the Wyoming Supreme Court proceeds as if the matter had come directly to us from the agency. *Southwest Wyoming Rehabilitation Center v. Employment Sec. Comm'n,* 781 P.2d 918, 920 (Wyo.1989); *Atchison v. Career Serv. Council,* 664 P.2d 18, 20 (Wyo.), *cert. denied,* 464 U.S. 982, 104 S.Ct. 424, 78 L.Ed.2d 359 (1983).

■ Our review of contested case orders focuses on the evidence and considers the reasonableness of the agency's exercise of judgment while determining if errors of law were committed or whether any constitutional rights were violated. We take the record as a whole and review whether substantial evidence supports the agency's findings of fact. *Amax Coal Co. v. Wyoming State Bd. of Equalization,* 819 P.2d 825, 828 (Wyo.1991). The burden of establishing the absence of substantial evidence belongs to the challenging party. *Union Tel. Co., Inc. v. Public Service Comm'n,* 821 P.2d 550, 557 (Wyo.1991). The court relies upon and affords deference to agency expertise in weighing the evidence, and determinations are not disturbed unless " 'clearly contrary to the overwhelming weight of the evidence on record.' " *Mekss v. Wyoming Girls' School,* 813 P.2d 185, 201 (Wyo.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 872, 116 L.Ed.2d 777 (1992) (*quoting State ex rel. Wyoming Workers' Compensation Div. v. Brown,* 805 P.2d 830, 833 (Wyo.1991)). Substantial evidence is " 'such relevant evidence as reasonable minds would accept as adequate to support a conclusion.' " *Employment Sec.*

*Comm'n v. Western Gas Processors, Ltd.,* 786 P.2d 866, 870, 86 A.L.R.4th 295 (Wyo. 1990) (*quoting Southwest Wyoming Rehabilitation Center v. Employment Sec. Comm'n,* 781 P.2d at 921).

■ We determine whether the agency conclusions of law, including those stated as ultimate facts, are "in accordance with law." *Amax Coal,* 819 P.2d at 829. Agency decisions are reversed only for errors of law. *Union Tel.,* 821 P.2d at 557. We summarized the three possibilities that exist when we review agency conclusions of law in *Western Gas,* 786 P.2d at 871:

The agency may correctly apply their findings of fact to the correct rule of law. In such case, the agency's conclusions are affirmed. But the agency could apply their findings of fact to the wrong rule of law or they could incorrectly apply their findings of fact to a correct rule of law. In either case, we correct an agency conclusion to ensure accordance with law. [citations omitted]

If the agency misapplies the correct rule of law, we do not defer to the agency's finding. *Wyoming Dep't of Employment, Div. of Unemployment Ins. v. Secrest,* 811 P.2d 733, 735 (Wyo.1991); *Union Pacific,* 802 P.2d at 860–61. The issues presented by CIM require that we first consider whether the Commission properly applied the law.

■ CIM contends the Examiner erred in placing the burden of proof on CIM to establish O'Brien left voluntarily without good cause. CIM believes that the correct application of substantive law would have placed the burden of proof on O'Brien to establish he left employment involuntarily. At that point, CIM admits the burden would then shift to the employer to establish a discharge for misconduct.

CIM's position proceeds from a faulty premise. CIM argues that after O'Brien filed his claim for unemployment benefits and the Deputy initially approved it, the appeal CIM filed created an administrative proceeding exercising "original rather than appellate jurisdiction." CIM's premise creates an analogy comparing O'Brien's claim to a "complaint" which CIM protested with

an "answer" creating the need for a "trial" at which the burden of proof would be placed on the "plaintiff," O'Brien.

Despite the *de novo* nature of the appeal hearing, *Yellow Front Stores, Inc. v. Indus. Comm'n*, 694 P.2d 882, 884 (Colo.App. 1985), the plain language of the WESL defeats CIM's premise. When a claim for unemployment insurance is filed, an initial eligibility determination is made by a deputy. W.S. 27–3–402(a) (1991). The determination is *"final* unless a party entitled to notice applies for redetermination or *appeals." Id.* (emphasis added). The "Notice to Employer of Initial Determination" was prepared on May 10, 1991. CIM exercised its right and *appealed* the Deputy's action. W.S. 27–3–402(e) (1991).

Under the WESL, disputed claims are heard by an "appeal tribunal" which can be an examiner or a three-member body. W.S. 27–3–403 (1991). The "appeal tribunal" must provide "notice of and a reasonable opportunity for hearing." *Id.* Under the WESL, appeals are conducted in accordance with WAPA. W.S. 27–3–405(a) (1991). WAPA requires a "reasonable notice" for contested case hearings. W.S. 16–3–107(a) (1990). The notice must include, "[a] short and plain statement of the matters asserted." W.S. 16–3–107(b)(iv) (1990).

CIM and O'Brien received a "Notice of Hearing" for an *"appeal* filed by employer." (emphasis added) The stated issue was: "Reason for claimant's separation from employment with Casper Iron & Metal, Inc." The parties, each represented by counsel at the hearing, were also informed: "Any other issues which may affect claimant's rights to benefits will be considered." While both the WESL and WAPA are silent on the proper allocation of the burden of proof, the "Notice of Hearing" contained sufficient information to inform CIM of its burden as the party seeking an appeal. The specific nature of the burden CIM acquired by filing the administrative appeal requires further definition.

▆▆▆▆ Burden of proof, as part of the substantive law of evidence, is complex and often confusing. *See* 1 D. Louisell & C.

Mueller, *Federal Evidence* § 65 (1977). The general term, burden of proof, identifies two separate legal doctrines: the burden of persuasion; and the burden of production, also termed the burden of producing evidence or the burden of going forward with the evidence. Louisell & Mueller, *supra,* § 66. The burden of persuasion is attached to the party who "runs the risk of nonpersuasion." *Id.* During a trial, this means if the "party with the burden of persuasion has not sustained it by a fair preponderance of the evidence—if the evidence is in equipoise or the opposing party's preponderates—the party with the burden must fail." *Id.* The burden of producing evidence is "the obligation of the party to present at the appropriate time * * * evidence on the issue involved of sufficient substance to permit the fact finder to act upon it." *Id.* The burden of producing evidence shifts during the presentation of evidence. *Id.* The burden of persuasion, which generally does not shift unless by the operation of a legal presumption, becomes operative only after all the evidence is submitted. *Id.*

This court previously ruled that burden of proof is recognized in contested case proceedings under WAPA. *Pan Am. Petroleum Corp. v. Wyoming Oil and Gas Conservation Comm'n*, 446 P.2d 550, 556 (Wyo.1968). The *Pan Am.* court noted the dual use of the term as a "burden of establishing the case as a whole," for the burden of persuasion; and the "burden on a party to make out a prima facie case in his favor at a certain stage during the hearing," which is the burden of producing evidence. *Pan Am.*, 446 P.2d at 556; 4 Jacob A. Stein et al., *Administrative Law* § 24.01 (rev. ed. 1991).

The proper application of burden of persuasion and burden of producing evidence doctrines requires consideration of the purpose of unemployment insurance. The purpose of the WESL, and similar statutes in other states, is to lighten the economic load created by *involuntary unemployment. California Dep't of Human Resources Dev. v. Java*, 402 U.S. 121, 131–32, 91 S.Ct. 1347, 1354, 28 L.Ed.2d 666 (1971); *Colora-*

*do Div. of Employment and Training v. Hewlett,* 777 P.2d 704, 706 (Colo.1989). Using state police powers, the legislature acted to protect the general welfare creating unemployment reserve accounts to be used for the benefit of persons *unemployed through no fault of their own. Nat'l Gypsum Co. v. State Employment Sec. Bd. of Review,* 244 Kan. 678, 772 P.2d 786, 789 (1989). The WESL should be liberally construed in favor of the claimant, and disqualifications from benefits should be narrowly construed. *Department of Indus. Relations v. Jaco,* 337 So.2d 374, 376 (Ala.Civ.App.1976); *Matter of Johnson,* 337 N.W.2d 442, 446 (S.D.1983).

The legislature specifically directed the circumstances which shall disqualify an individual from unemployment benefits. W.S. 27–3–311 (1991). Two provisions are relevant to this case. The first is disqualification from benefits for discharge "from his most recent work for misconduct connected with his work." W.S. 27–3–311(c) (1991). The second is disqualification for quitting or leaving work "voluntarily without good cause attributable directly to his employment." W.S. 27–3–311(a)(i) (1991). Whether unemployment results from a discharge or a voluntary quit is often "a close question." *Valley Vendors, Inc. v. Jamieson,* 129 Ariz. 238, 240, 630 P.2d 61, 63, 18 A.L.R.4th 298 (App.1981). However, to be eligible for benefits, the reason for unemployment must be external and apart from the claimant, regardless of whether the employment ended by discharge or a voluntary quit. *Read v. Employment Sec. Dep't,* 62 Wash.App. 227, 813 P.2d 1262, 1266 (1991).

In administrative law, the "central concern" is on the burden of producing evidence. *Environmental Defense Fund, Inc. v. Environmental Protection Agency,* 548 F.2d 998, 1013 (D.C.Cir.1976), *cert. denied,* 431 U.S. 925, 97 S.Ct. 2199, 53 L.Ed.2d 239 (1977); *see* 3 K. Davis, *Administrative Law Treatise* § 16:9 (1980). In the context of unemployment insurance, the initial evidentiary burden of a claimant is satisfied when a prima facie showing is made and benefits are allowed. *Java,* 402 U.S. at 134, 91 S.Ct. at 1355. The Commis-sion's acceptance of a claimant's statement supporting a benefits application means the claimant has met the burden and established a prima facie showing. *Lucero v. Indus. Claim Appeals Office,* 812 P.2d 1191, 1193 (Colo.App.1991); *Denver Symphony Ass'n v. Indus. Comm'n,* 526 P.2d 685, 687 (Colo.App.1974). The initial determination in favor of eligibility means that benefits are due the claimant. W.S. 27–3–409(a) (1991); *see Java,* 402 U.S. at 134, 91 S.Ct. at 1355.

If the employer seeks to challenge the benefits determination, the burden is on the employer to present contrary evidence. *Arizona Dep't of Economic Sec. v. Magma Copper Co.,* 125 Ariz. 23, 26, 607 P.2d 6, 9 (1980); *Denver Symphony,* 526 P.2d at 687; *Norland v. Iowa Dep't of Job Serv.,* 412 N.W.2d 904, 910 (Iowa 1987). The employer's evidence must disclose a statutory ground for benefits disqualification. *Hewlett,* 777 P.2d at 707.

Sound policy supports placing the burden of producing evidence on the employer when an appeal is filed. The reason is apparent from a consideration of why an employer would challenge the benefits payment. Since unemployment benefits are chargeable against an employer's account, the appeal may protect the balance in the employer's unemployment compensation fund. *See* W.S. 27–3–201 (1991). The employer should, therefore, possess the burden of producing evidence proving disqualification. *Lozano v. California Unemployment Ins. Appeals Bd.,* 130 Cal.App.3d 749, 182 Cal.Rptr. 6, 10 (1982).

CIM's misperception of its obligation is apparent from the transcript of the hearing. At the beginning of proceedings, CIM's counsel attempted to defer calling any witnesses except in rebuttal. The Examiner informed CIM that, as appellant, "It's your responsibility to provide sufficient testimony and evidence to persuade me to change the decision that's been made by the Deputy." CIM's counsel then attempted to dismiss CIM's appeal, apparently in a belief that O'Brien would then have the burden of producing evidence: "At this time I move that, ah, the appellants, ah,

being as they do have the burden, that the appellant's objection be dismissed, you know * * *." The Examiner interrupted and stated she saw no reason to deviate from the normal hearing procedure.

 The issue before the Examiner was not whether O'Brien was initially eligible for benefits. When the Deputy allowed the claim, it constituted a determination that benefits were due O'Brien, and he was "not disqualified." *Java*, 402 U.S. at 134, 91 S.Ct. at 1355. The Examiner took "official notice" of the records in O'Brien's file, including the Deputy's determination, at the beginning of the appeal hearing. Therefore, the legal issue to be resolved by the hearing was whether O'Brien's benefit determination should be modified or reversed based upon proof of a statutory disqualification. CIM possessed the burden to produce evidence of disqualification at the hearing. If CIM had made a sufficient showing, the burden of producing evidence would have shifted to O'Brien to refute CIM's proof. *See Employment Sec. Comm'n v. Bryant*, 704 P.2d 1311, 1317 (Wyo.1985) (holding claimant who failed to appear before hearing examiner or Commission to give testimony or ask that matters in files be noticed did not meet his "burden of proof").

 CIM steadfastly maintains that the Examiner erred when she required CIM to meet the "artificial and unannounced burden to prove misconduct." CIM misconstrues the Examiner's findings. Implicit in the Deputy's determination of benefits eligibility is a finding that O'Brien was discharged from employment with CIM and, therefore, eligible for unemployment benefits. On appeal, CIM had to show the existence of a statutory disqualification. In this case, disqualification would have occurred if it was established either that O'Brien was discharged for misconduct or that O'Brien left work voluntarily without good cause. W.S. 27-3-311 (1991). CIM failed to convincingly rebut O'Brien's prima facie case.

This court accepted the Commission's definition of misconduct in *Safety Medical Serv., Inc. v. Employment Sec. Comm'n*, 724 P.2d 468, 472 (Wyo.1986):

Misconduct under the Wyoming Employment Security Law means generally an act of an employee which indicates a disregard of (1) the employer's interests or (2) the commonly accepted duties, obligations and responsibilities of an employee. This would include carelessness or negligence of such degree or recurrence as to reveal willful intent or an intentional disregard of the employer's interests or of the employee's duties and obligations to his employer. Inefficiency or failure in good performance as the result of inability or incapacity; ordinary negligence in isolated instances or good faith errors in judgment or discretion are not deemed to be misconduct within the meaning of the Law.

In determining if misconduct was present, the question is whether the employee intentionally acted contrary to his or her responsibility to perform assigned duties or willfully and *intentionally* disregarded known employer interests. *Id.* at 473 (emphasis in original); *see also Western Gas*, 786 P.2d at 873.

CIM's misconduct evidence was minimal and constituted primarily vague recitations of undocumented past incidents of alleged disobedience which would be insufficient to support termination. O'Brien's absence on his final day of work could only be considered misconduct if CIM had documented an intentional action in disregard of known company policy. CIM maintains in its brief that the "Employee Time-Off" form O'Brien completed was improperly submitted because it was not provided to management at least a day prior to the absence. The company president's testimony does not support CIM's contention. Sidney Tolin testified that the employee requesting leave *"usually"* completes the form a "day or so" before the absence so that another employee can be substituted. The back of the "Employee Time-Off" form contains a lengthy description of CIM's absenteeism and tardiness policy which makes no mention of requiring completion of a request form one day prior to the absence. CIM submitted no documentary evidence estab-

lishing the existence of an advance notice rule. No evidence was introduced showing that O'Brien had notice of requirements for advance notification. Evidence of the past enforcement practices when employees violated the rule was also not presented. Without reducing the rule to writing and making the requisite showing of employee knowledge and consistent enforcement, CIM failed, as a matter of law, to establish a misconduct violation. *Blackwell v. Review Bd. of Indiana Dep't of Employment and Training Serv.*, 560 N.E.2d 674, 678–79 (Ind.App.1990). O'Brien's action in completing the form actually reflects an effort to preserve his employment.

■■■ Defining the meaning of the word "voluntarily" when that term is applied to an employee who leaves work, W.S. 27–3–311(a)(i) (1991) is a matter of law. *Southwest Wyoming Rehabilitation Center v. Employment Sec. Comm'n*, 781 P.2d 918, 921 (Wyo.1989). As used in the WESL, voluntary connotes " '[u]nconstrained by interference; unimpelled by another's influence; spontaneous; acting of oneself * * * [r]esulting from free choice.' " *Shuler v. Virginia Employment Comm'n*, 9 Va. App. 147, 384 S.E.2d 122, 124 (1989) (*quoting* Black's Law Dictionary 1413 (5th ed. 1979)). Similar language in other jurisdictions' statutes has been interpreted to require "some manifestation of intent to quit" to show a claimant voluntarily left employment. *Blackwell*, 560 N.E.2d at 677; *Monaco v. Unemployment Compensation Bd. of Review*, 523 Pa. 41, 565 A.2d 127, 129 (1989); *Johnson*, 337 N.W.2d at 447. Merely leaving the premises of employment is not enough to determine intent, *Johnson*, 337 N.W.2d at 447; the totality of the circumstances must be considered. *Monaco*, 565 A.2d at 129.

The bulk of CIM's evidentiary presentation attempted to contradict the discharge claim. CIM tried to establish O'Brien had left work voluntarily using Sidney Tolin's testimony that O'Brien had previously been talked out of quitting and the affidavits of two CIM employees that O'Brien told them on the day he left he was quitting. CIM counsel, Don Tolin, also vigorously cross-examined O'Brien and those testifying at the hearing in his behalf.

O'Brien refuted CIM's contention that he quit voluntarily with his own testimony that he did not intend to quit when he left work. O'Brien also denied telling co-workers on April 24, 1991, that he was quitting. O'Brien's version was persuasively supported by the introduction of the CIM "Employee Time–Off" forms accounting for O'Brien's absence from work. A co-worker at CIM, Barry Texas, testified that O'Brien had no intention of quitting when he went to the Labor Board.

The critical finding was that CIM's action in "pulling" O'Brien's time card terminated his employment. The examiner noted this action "is commonly construed as a discharge." Even though the Examiner allowed CIM a broad range of flexibility during its evidentiary presentation, including numerous leading or irrelevant questions from counsel, CIM's contention that O'Brien left voluntarily was not supported with sufficient evidence. If O'Brien had intended to leave voluntarily, he would not have completed the "Employee Time–Off" forms. It is also unlikely he would have engaged in such an obscene attack on his employer after being told he "quit." With deference to the Commission's expertise in employment matters, we hold substantial evidence supports the finding that O'Brien's employment terminated at the hands of CIM, the employer.

### CONCLUSION

The Commission's application of law was proper; and its determination, supported by substantial evidence, was reasonable. The decision of the district court, therefore, is affirmed.

THOMAS, Justice, concurring specially.

The Moving Finger writes; and, having writ,
Moves on: nor all your Piety nor Wit
Shall lure it back to cancel half a Line,
Nor all your Tears wash out a Word of it.

*The Rubáiyát of Omar Khayyám,* Stanza 71, AN ANTHOLOGY OF WORLD POETRY 126 (translated by Edward FitzGerald) (Van Doren ed. 1936).

The immortal words of the poet maintain their verity.

## FAMILIARITY BREEDS CONTEMPT.

AESOP'S FABLES, *The Fox and the Lion* 24 (The Harvard Classics 1909).

While the courts of Wyoming well may know all the profane words, Aesop graphically articulates the difference between knowing something and familiarity with it.

I concur in the result of this opinion, but I am unable to join in the opinion. Vulgarity for the sake of vulgarity has no real place, but it is particularly inappropriate in an opinion of a supreme court. "If it looks like a duck, walks like a duck, and quacks like a duck, it must be a duck." *City of Laramie v. Facer,* 814 P.2d 268, 273 (Wyo. 1991). It is unfortunate that the court is compelled, for whatever reason, to emulate a naughty. schoolboy attempting to shock the teacher. The result of our decisions is often sufficiently shocking that it is specious to attempt to do it with vulgar language.

In the course of this court's work, occasions may arise when coarse language is necessary and, for that reason, appropriate. It is indeed probable that situations may arise when such statements are a necessary part of the material facts. Despite the attempt in this instance to justify the inclusion of the vulgarities, this language is not necessary to understand the decision of the hearing officer. In his Findings and Conclusions, the Appeals Examiner found it sufficient to report:

> The claimant protested that he had not intended to quit and entered into **an exchange of verbal obscenities with his employer.** (Emphasis added.)

In explaining his decision, the Appeals Examiner afforded no significance to this exchange, saying:

> The claimant's actions in contacting the Labor Board, or any other regulatory agency, were within his rights. The

claimant intended his absence to be temporary and completed the appropriate paperwork for the employer indicating that his absence was intended to be temporary. The employer's action in "pulling his time card" is an action which is commonly construed as a discharge. The claimant took no action to end his employment. The end of the employment was determined by the employer. The claimant was discharged but there is insufficient evidence to support a finding that the discharge was for misconduct connected with his work. The claimant is, therefore, not subject to disqualification.

The material facts had ended before the argument occurred out of which the gutter language is quoted, and that language is not relevant to any of the issues in this appeal. The inclusion of those vulgarities serves only to denigrate both the work place and the Supreme Court of Wyoming. It is interesting to note that to the extent the parties found it necessary to address this exchange in materials furnished through counsel to the Unemployment Insurance Commission, they described the event as "screamed obscenities," "yelling obscenities," "yell obscenities in a loud and abusive manner," "use obscenities," and "scream obscenities."

The statement of the issues and the able resolution of those issues in the court's opinion belie the claimed justification for using this language. It appears in the Brief of Appellee, but its use should not be condoned by repetition. I am firmly of the conviction that the citizens of Wyoming deserve the portrayal of a better image by their highest court than this opinion presents. How can we expect to enjoy a shining image in the eyes of our constituency if we go to such lengths to tarnish it ourselves. It is truly unfortunate that this opinion will be remembered, not for the able treatment of the legal issues, but because of the unnecessary invocation of such vulgarity. I am disappointed.