**BURLINGTON NORTHERN RAILROAD COMPANY,**
Appellant (Petitioner),

v.

The **PUBLIC SERVICE COMMISSION OF WYOMING,** Appellee
(Respondent).

No. 84–179.

Supreme Court of Wyoming.

April 25, 1985.

Rehearing Denied May 24, 1985.

Julie Nye Tiedeken of Godfrey & Sundahl, Cheyenne, for appellant.

A.G. McClintock, Atty. Gen., Steven R. Shanahan, Sr. Asst. Atty. Gen., Michael L. Hubbard, Asst. Atty. Gen., Cheyenne, for appellee.

Before THOMAS, C.J., and ROSE, ROONEY, BROWN and CARDINE, JJ.

BROWN, Justice.

This appeal seeks review of an administrative action of appellee Public Service Commission (hereinafter PSC). Appellant Burlington Northern Railroad Company (hereinafter Burlington Northern) sought removal of a switch located in Sheridan. The PSC granted the request, but also ordered that the switch be moved to a safer location and that the present service to customers located on the industrial spur track served by the switch be maintained. Burlington Northern appeals that part of the PSC's order requiring the relocation of the switch.

We will modify the PSC's order requiring Burlington Northern to relocate the switch and affirm in all other respects.

Appellant Burlington Northern raises the following issues:

"I. Whether the findings and conclusions of the commission are unsupported by substantial evidence.

"II. Whether the order of the commission is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.

"III. Whether the findings and conclusions of law are inadequate as a matter of law."

Appellee PSC words the issues a bit differently:

"(1) Are the findings of fact and conclusions of law of the commission supported by substantial evidence and has the appellant sustained its burden of proving a lack of substantial evidence?

"(2) Did the appellant sustain its burden of proving a lack of public convenience and necessity for continued service along Track 20?

"(3) Does the commission's order provide for basic fact finding, which provided the underlying facts upon which the commission's conclusions are drawn?"

I

Burlington Northern filed a request with the PSC requesting the removal of a switch located in Sheridan. The switch is located on a main track passing through downtown and provides access to Track 20, an industrial spur track.[1] Burlington Northern sought removal of the switch for safety and economic reasons. The switch is located on a curve, and trains passing over it are required to slow down to approximately fifteen miles per hour. This slow speed has caused traffic congestion in the downtown area. With the switch removed, replaced with a safe switch, or relocated on a straight portion of the track, trains could pass through the area at approximately 25 miles per hour, thus alleviating part of the traffic congestion problem.

Additionally, there have been three caboose derailments in the past year and a half at the switch location. Furthermore, there were two derailments in 1983 which destroyed the switch. While the switch did not directly cause the derailments, it compounded the accidents by allowing more cars to derail. Presently, the switch is out of service and has not been replaced since the last derailment. Removal of the switch, or replacement with a safer switch, would greatly reduce the danger of derailment.

There has been a significant increase in the amount of train traffic passing through the area in which the switch is located. In 1981, a study indicated approximately fourteen trains per day passed through the area. As of January, 1984, the traffic had

---

1. Spur track is defined as "a track that diverges from a main line." Webster's Third New International Dictionary, p. 2213 (1966).

increased to approximately 42 to 45 trains per day.

A Burlington Northern engineer testified it would cost approximately $78,000 to relocate the switch to a tangent track and still provide access to Track 20. It is Burlington Northern's contention that the revenues generated from the present limited use of Track 20 do not warrant the cost of the switch relocation.

The following table reflects the number of railroad cars received and forwarded by three companies located on Track 20.

|  | 1979 | 1980 | 1981 | 1982 | 1983 |
|---|---|---|---|---|---|
| NORTHERN SEED | 10 | 4 | 1 | 1 | 0 |
| SHERIDAN COMMERCIAL | 18 | 17 | 13 | 0 | 6 |
| VALLEY MOTORS | 0 | 1 | 2 | 2 | 2 |

The amount of income generated to Burlington Northern from the cars on Track 20 from 1979 to 1983 is as follows:

|  | 1979 ($) | 1980 ($) | 1981 ($) | 1982 ($) | 1983 ($) |
|---|---|---|---|---|---|
| NORTHERN SEED | 13,149 | 5,563 | 1,040 | 1,205 | -0- |
| SHERIDAN COMMERCIAL | 40,009 | 41,672 | 42,900 | -0- | 19,800 |
| VALLEY MOTORS | -0- | 2,515 | 6,030 | 6,414 | 7,499 |

It should be noted that Valley Motors did not begin business until June, 1980.

Burlington Northern offered to sell Track 20 to the commercial customers whose property abuts the track, but the offer was refused for economic reasons. Several businesses served by Track 20 protested the removal of the switch: Northern Seed Company, Sheridan Commercial Company, L.H. Brooks Realty Co., Mac's Delivery and Storage, N.O. Nelson Company, and Valley Motor Supply. Burlington Northern proposed that the businesses no longer served by the spur track after removal of the switch could use a team track located some three to four blocks away.[2]

Officials for Northern Seed Company testified they have not used the spur track greatly in the past couple of years due to the high expense of rail shipments compared to lower trucking rates. In the past, however, they used rail shipments for all of their fertilizer and roughly 80 percent of their feed. They plan on using the railroad again in the future if rail rates become comparable to trucking rates. Northern Seed has undertaken a costly construction project to modify their building to facilitate rail delivery. Northern Seed officials testified they would probably never use the team track because only sacked material could be handled there and this constitutes roughly 50 percent of their shipments. Furthermore, the sacked material would have to be loaded onto trucks to be hauled the three to four blocks to the building.

The manager of Sheridan Commercial Supply testified his facility and Northern Seed were the only two bulk-grain facilities in town. Thus, if rail service to Track 20 is ended, there will be no bulk-grain facilities to serve Sheridan. Sheridan Commercial shipped six rail cars in 1983 for a total revenue to Burlington Northern of $19,800. Sheridan Commercial has relied heavily on rail service in the past, and will use it again in the future if it has sufficient grain to ship.

The owner/operator of Mac's Delivery and Storage testified they unload pool cars for various merchants in the city. The business was purchased because of its accessibility to the railroad track. In the past, Mac's Delivery handled up to ten cars per year for various merchants, but that figure has dropped significantly in recent times due to increased rail rates compared to lower trucking rates. Like the other businesses located on Track 20, Mac's Delivery will use the track more if rail rates become more competitive with trucking rates. Mac's Delivery has unloaded cars on the team track but finds it is inconvenient for items to be stored in their warehouse, which is located along Track 20.

The president of Valley Motor Supply testified the company's one-half million dollar building was constructed along Track 20 to facilitate rail shipments. Valley Motor Supply can receive its clay material only by rail, which comes from the Carolinas. If forced to use the team track, the

2. Team track is defined as "a siding with public access on which freight cars are placed for loading or unloading by shippers and consignees." Webster's Third New International Dictionary, p. 2346 (1966).

company would have to haul the clay by truck to its facility, at great inconvenience and expense. The president of Valley Motor Supply testified it would take forty pickup loads to move the material to the business location. Valley Motor Supply began business in June of 1980, and in that year received one carload of clay material. Since then, Valley Motor has received two carloads per year resulting in gross revenues to Burlington Northern in excess of $19,000. Valley Motor Supply estimates its rail shipments will increase in the future as such product is necessary to the coal mining industry.

The president and manager of N.O. Nelson Company testified his business is equipped to receive rail shipments of steel pipe and other equipment from Track 20, but the seller of the pipe has shipped by truck instead of rail for the past ten years. The reason for choosing truck freight is due to economical considerations, but rail shipment is more convenient for the company and the value of the property would be decreased in the event rail service is terminated.

A hearing was held and the PSC subsequently rendered its decision, finding:

"1. The application of Burlington Northern Railroad Company to remove a switch located in Sheridan, Wyoming is approved.

"2. It is further ordered that Applicant shall continue to serve customers located on Track 20 in Sheridan, Wyoming, and that it shall relocate the switch so that service will be maintained.

"3. This order is effective immediately."

Burlington Northern appeals from that part of the order requiring them to continue serving the businesses located on Track 20.

## II

The scope of our review of an appeal from an administrative action is directed by § 16-3-114, W.S.1977.[3] Under that statute, we are bound to review the

---

3. Section 16-3-114, W.S.1977, reads:

"(a) Subject to the requirement that administrative remedies be exhausted and in the absence of any statutory or common-law provision precluding or limiting judicial review, any person aggrieved or adversely affected in fact by a final decision of an agency in a contested case, or by other agency action or inaction, or any person affected in fact by a rule adopted by an agency, is entitled to judicial review in the district court for the county in which the administrative action or inaction was taken, or in which any real property affected by the administrative action or inaction is located, or if no real property is involved, in the district court for the county in which the party aggrieved or adversely affected by the administrative action or inaction resides or has its principal place of business. The procedure to be followed in the proceeding before the district court shall be in accordance with rules heretofore or hereinafter adopted by the Wyoming supreme court.

"(b) The supreme court's authority to adopt rules governing review from agencies to the district courts shall include authority to determine the content of the record upon review, the pleadings to be filed, the time and manner for filing the pleadings, records and other documents and the extent to which supplemental testimony and evidence may be taken or considered by the district court. The rules adopted by the supreme court under this provision may supersede existing statutory provisions.

"(c) To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:

"(i) Compel agency action unlawfully withheld or unreasonably delayed; and

"(ii) Hold unlawful and set aside agency action, findings and conclusions found to be:

"(A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

"(B) Contrary to constitutional right, power, privilege or immunity;

"(C) In excess of statutory jurisdiction, authority or limitations or lacking statutory right;

"(D) Without observance of procedure required by law; or

"(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute."

entire record to see if the agency's action is supported by substantial evidence. If so, we must uphold the agency's actions and not substitute our judgment for that of the agency's. *Mountain Fuel Supply Company v. Public Service Commission of Wyoming,* Wyo., 662 P.2d 878 (1983); *McCulloch Gas Transmission Company v. Public Service Commission of Wyoming,* Wyo., 627 P.2d 173 (1981); *Williams v. Public Service Commission of Wyoming,* Wyo., 626 P.2d 564, cert. denied 454 U.S. 896, 102 S.Ct. 394, 70 L.Ed.2d 211 (1981); *Board of Trustees of School District No. 4, Big Horn County v. Colwell,* Wyo., 611 P.2d 427 (1980). Substantial evidence has been defined "as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Board of Trustees, Laramie County School District No. 1 v. Spiegel,* Wyo., 549 P.2d 1161, 1178 (1976), quoting *Consolo v. Federal Maritime Commission,* 383 U.S. 607, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966). Substantial evidence may indeed be less than the great weight of the evidence, but is more than a mere scintilla of evidence, *Mountain Fuel Supply Company v. Public Service Commission of Wyoming,* supra, at 882. The possibility of drawing two inconsistent conclusions from the evidence presented does not preclude the agency's conclusion from being supported by substantial evidence. *Board of Trustees, Laramie County School District No. 1 v. Spiegel,* supra. The burden is on appellant to prove arbitrary, illegal or fraudulent action by the agency. *Wyoming Bancorporation v. Bonham,* Wyo., 527 P.2d 432 (1974), 563 P.2d 1382 (1977), reh. denied 566 P.2d 219 (1977).

■ Applying those principles to the present case, we find there was substantial evidence upon which the PSC could find as it did. It is clear from our review of the record that the location of the switch presented a safety hazard and required removal or relocation, or installation of a safer switch at the present location. In its decision the PSC stated:

" * * * As to the switch, there can be little doubt but that it should be relocated. The Commission is satisfied that its present location in the curve of the track in Sheridan is a safety hazard and lends itself to congestion in the City of Sheridan. Removal or relocation of the switch itself will allow rail traffic speed to increase and reduce congestion at certain intersections by as much as 70%. In addition, the Commission is persuaded by the testimony of Applicant's engineer that the switch's location in the curve of the track creates a greater possibility of derailment and accompanying property loss. The public convenience and necessity is served by the removal and/or relocation of the subject switch."

■ The PSC also ordered that service to the industrial customers on Track 20 be continued. After careful review of the record, we also find such action supported by substantial evidence. As indicated by the facts in Part I of this opinion, there is a need for the rail service to Track 20 to be continued. We hold that the interests of public convenience and necessity will be furthered by maintaining rail service to the businesses located on Track 20. All the representatives of such businesses who testified at the hearing expressed such a desire. Additionally, the Sheridan Chamber of Commerce passed a resolution officially endorsing the continuance of rail service to Track 20. The mayor of Sheridan also testified on behalf of the protestant businesses that there would be a negative economic impact on the affected businesses if rail service was terminated.

The PSC found that Burlington Northern's main interest in removing the switch altogether was due to increased traffic congestion on the track, not the limited revenues generated by Track 20:

" * * * The Commission is satisfied that Burlington Northern has failed to meet its burden in proving that the public convenience and necessity justify abandonment of service to the affected commercial customers.

 *　　*　　*　　*　　*　　*

"The Commission is satisfied that Burlington Northern's primary impetus in applying for the switch removal was not because of the decreased rail use by their commercial customers, but because of increased rail traffic coursing through the downtown Sheridan area. Having identified a need to remove the switch from its present location, Applicant does not now feel justified in relocating the switch to a different location given the present level of traffic to the commercial customers.

\* \* \* \* \* \*

"\* \* \* [T]otal revenues for the three companies given by the Applicant were $27,299 for 1983 as against $53,138 from 1979. Clearly, there has been a reduction of rail traffic from this industrial spur but the railroad is still receiving significant revenues from the commercial customers located there. The record does not reflect the yearly expenses experienced by Applicant in maintaining the industrial spur, although a witness for the Applicant testified that the spur was in excellent condition and required little annual maintenance given the reduced traffic levels. \* \* \* "

The PSC further found that the interests of public convenience and necessity would be furthered by the maintenance of service to Track 20. And since Burlington Northern sought removal of the switch to further its own purposes, the PSC stated it should pay for its relocation:

"As the primary motivation for the removal of the switch is attributable to the needs of the railroad, Applicant shall be required to provide continuing service to the commercial customers. As stated by the Wyoming Supreme Court, the critical issue in any service abandonment is the balancing between the public good, its convenience and necessity against railroad expense. In this case, though the railroad will be required to expend money to relocate its switch, it is being required to accomplish this, not because of reduced traffic on the industrial spur, but because of the need to expedite the increased traffic on its main line.

\* \* \* \* \* \*

"\* \* \* The switch was located in the curvage of the track in 1917 by the railroad, and maintained by the railroad company to the present while commercial customers relied on the railroad's positioning of the switch and the spur track, the cost of the switch relocation should be borne by the cost causer or Applicant itself."

In the case of *Union Pacific Railroad Company v. Public Service Commission of Wyoming*, Wyo., 518 P.2d 23 (1974), Union Pacific sought permission to close the railroad station in Burns because of poor business. Such request was denied by the PSC and affirmed by this court. We addressed the issue of profitability, stating, "While it is true that the profitability aspect \* \* \* is not controlling but merely one element to be viewed along with various others \* \* \* "; but we concluded that the paramount consideration in determining whether a service should be discontinued was public good, convenience and necessity.

"\* \* \* Our research leads us to believe that for practical purposes the correct rule is that if the public good, its convenience and necessity, outweighs the expense of the railroad in continuing such agency the commission is justified in denying the request for closing. [Citations.]

"Some evidence was presented to the commission purporting to show that there would be future development in the Burns area and that lack of an agency would impede this. That feature although conceivably pivotal in some situations would be superfluous to any decision where the public's present necessity and convenience is clear. Accordingly, the paramount question before us is whether or not the public convenience and necessity require that the agency station remain at Burns; and it is basic that the burden of proving lack is upon

the carrier seeking discontinuance of the agency. [Citation.]" Id., at 25.

See also, *Chicago & North Western Railway Company v. Public Service Commission of Wyoming*, 79 Wyo. 343, 334 P.2d 519 (1959).

■ We believe the PSC's order should be modified to the effect that Burlington Northern should be given a choice as to how continued service to Track 20 should be facilitated. We agree with the PSC that there is clearly a need for continued service to Track 20, but we do not believe the PSC had authority to order Burlington Northern to relocate the switch; that decision should be left with the railroad. If Burlington Northern feels a safer switch can be placed in the same position as the old, sobeit. If the railroad wishes to relocate the switch, this too should be their decision. Normally, the PSC is only in the posture of approving or disapproving requests; it cannot generally order a public utility to serve a certain area. See, e.g., *Missouri Pacific Railway Company v. State of Nebraska*, 217 U.S. 196, 30 S.Ct. 461, 54 L.Ed. 727 (1910), where a Nebraska statute requiring a railroad to build a spur track to reach grain elevators erected adjacent to its right of way at the railroad's expense was held a denial of due process and unconstitutional under the Fourteenth Amendment. See also *Chicago, M. & St. P. Ry. Co. v. Board of Railroad Com'rs.*, 76 Mont. 305, 247 P. 162 (1926).

The PSC's order is modified insofar as it requires Burlington Northern to relocate the switch. There was substantial evidence upon which the PSC determined that service should be continued to Track 20. Burlington Northern can relocate the switch, or rebuild a safe switch in its present location to continue service to Track 20. What we have said previously disposes of appellant's claim that the findings of the PSC were "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law," and we are satisfied with the adequacy of the findings of fact and conclusions of law.

Modified and affirmed.