**William S. LUND, Appellant**
**(Defendant),**

v.

**Janice M. LUND, Appellee (Plaintiff).**

**Janice M. LUND, Appellant (Plaintiff),**

v.

**William S. LUND, Appellee (Defendant).**

Nos. 91–261, 91–262.

Supreme Court of Wyoming.

March 25, 1993.

James L. Applegate, Hirst & Applegate, Cheyenne, and James B. Page, Page & Associates, P.C., Boulder, CO, for William S. Lund.

Floyd R. King, King & King, Jackson, for Janice M. Lund.

Before MACY, C.J., THOMAS, CARDINE and GOLDEN, JJ., and URBIGKIT, J., Retired.

THOMAS, Justice.

The significant, substantive issue in this case is whether the trial court erred in arriving at a division of marital property that did not invoke an antenuptial agreement which had been adjusted by a later agreement. There is a threshold question, involving legal and judicial ethics, which is whether this case must be reversed and remanded for a new trial because of misconduct of counsel for the wife and the court in engaging in an ex parte hearing from which counsel for the husband and his client were excluded. A cross-appeal has been taken by the wife, alleging error in the failure of the trial court to award attorney fees and costs to her in connection with this divorce action and other ancillary litigation. We hold the ex parte hearing clearly was improper and cannot be condoned under the Canons of Judicial Conduct and ethical rules governing the bar. However, we hold no reversible error should be attributed to the conduct of that hearing since it did not impact any substantial rights of the husband. With respect to the question on the merits, however, we hold the trial court was obliged to enforce the agreements of the parties to the marriage, at least in the absence of a cogent rationale justifying its refusal to apply those agreements. We reverse and remand for a new trial on the division of the marital property. Because of this disposition, we do not address the wife's cross-appeal with respect to the propriety of the denial by the trial court of attorney fees and costs to the wife.

The appeal and cross-appeal were consolidated for purposes of briefing and oral argument. In his opening brief as appellant, the husband states these issues:

I. Whether the trial court erred as a matter of law in failing to distribute the parties' assets in accordance with the antenuptial agreement.

II. Whether the errors in the order nunc pro tunc demonstrate plain error and an unconscionable abuse of discretion.

III. Whether the trial court's distribution of assets was shocking to the conscience and an abuse of discretion.

IV. Whether the trial court's ex parte hearing with Mrs. Lund and her attorney requires a remand for a new trial.

As appellee and cross-appellant, the wife asserts these issues:

I. Did the trial court exercise its sound discretion in determining the disposition of the marital assets?

II. Did the trial court abuse its discretion in failing to award appellee her attorney's fees and costs incurred in connection with the divorce and related proceedings?

The parties, Janice M. Lund and William S. Lund, met in December of 1977 and, after dating for several years, they were married on June 6, 1981. Both had been married twice previously, and each of them had children from the prior marriages.

Mr. Lund earned a degree from Stanford University in 1956 and, in the course of his career, he was employed as a petroleum engineer; was involved in the banking industry; assisted in forming one bank and served on the board of two banks; was engaged in industrial marketing; served as a college president; served on the boards of internationally known firms and organizations; and also was self-employed as a business consultant as well as a management consultant. Since 1971, Mr. Lund's primary occupation has been that of a real estate investor and developer. He had a net worth in excess of $5 million at the time he married Mrs. Lund.

Mrs. Lund's net worth at the time of the marriage was less than $200,000. She was first married when she was fourteen, had two children of that marriage, and was married for eleven years. In 1968, she married for the second time and was divorced two years later. She remained single after that divorce until her marriage to Mr. Lund in 1981. Mrs. Lund finished high school through home teaching and later attended Taft College, Bakersfield College, Fresno State, and U.C.L.A., studying psychology and business, but she never did complete a degree. She has had a varied employment history, including working for a school district psychology department in evaluations and testing; working for an accounting firm; managing a doctor's office; working in a public relations department and also working as a real estate salesperson.

Because of the difference in their relative net worth, Mrs. Lund insisted that she and Mr. Lund enter into an antenuptial agreement prior to their marriage. The antenuptial agreement provided that the separate property of the parties, whether obtained before or during the marriage, would remain the separate property of each, except that Mrs. Lund was to receive 50% of the equity in two homes if they remained married for at least four years. (The agreement appears to contemplate a division of money rather than the property.)

During their marriage, the Lunds lived in an affluent style commensurate with Mr. Lund's wealth. They separated in August of 1987, however, because Mr. Lund refused to slow down and continued to pursue high risk business ventures. Prior to that time, in 1985, one of the two homes in which Mrs. Lund was to receive a 50% equity had been sold. After the separation, the Lunds entered into another agreement dated September 25, 1987, entitled "First Amendment to Antenuptial Agreement." The thrust of this agreement was that Mr. Lund would pay Mrs. Lund $1 million. We note that title to "Eagle's Landing," a residence located in Teton County, Wyoming, al-

ready had been transferred to Mrs. Lund. At the same time, another agreement was prepared entitled "First Amendment to Restated Shareholder's Agreement." This latter document does not enter into this action except to the extent that it demonstrates a concerted effort by the parties to resolve their differences. Still later, in November of 1987, the other home in which Mrs. Lund was to have received 50% of the equity was sold.

At the end of the trial, the court issued an order that directed Mr. Lund to pay Mrs. Lund the sum of $300,000 plus interest. Mr. Lund, through counsel, filed a Motion to Modify Order because of factual errors in the initial order. In an order nunc pro tunc, the trial court corrected some of the numerical errors that had been called to the court's attention by Mr. Lund, but the court did not change the amount Mr. Lund was ordered to pay Mrs. Lund.

In its order nunc pro tunc, the trial court ruled that, while Wyoming recognizes the validity of antenuptial agreements as contracts, it would not enforce the agreement between the Lunds because the properties which were the subject of the agreement had been sold, thus making it impossible to satisfy the obligations under the antenuptial agreement. Further, the trial court found the First Amendment to Antenuptial Agreement was void and unenforceable on several separate and independent grounds. Mr. Lund appealed from the order of the court, which was followed by a cross-appeal by Mrs. Lund. The primary substantive issue before this court is the failure of the trial court to enforce the antenuptial agreement.

■ Before we resolve the substantive issue, we address the threshold question of whether the case must be reversed and remanded for a new trial because of the misconduct of counsel and the court in pursuing an ex parte hearing from which Mr. Lund and his attorney were excluded. On the third day of the trial, while Mr. Lund's attorney was cross-examining Mrs. Lund about the location of $1.2 million Mrs. Lund

had placed in accounts in foreign countries in violation of a previous court order, the court interrupted the trial proceedings to confer with the attorneys for the respective parties. After that conference, the court ordered Mrs. Lund to have those funds immediately transferred to depositories inside the continental United States and directed her to furnish proof of the transfer to the court. The court then recessed until such time as that transfer could be accomplished. After the recess, the trial judge conducted a hearing in her chambers involving the judge, Mrs. Lund, and Mrs. Lund's attorney concerning those assets. The record discloses that the law clerk of the Ninth Judicial District as well as the official court reporter for the trial judge also were in attendance. The proceeding was reported.

The next day, Mr. Lund's attorney objected to the ex parte hearing, stating:

[Mr. Lund's Counsel]: * * * Essentially when we recessed yesterday, the Court ordered some action to take place, and I understand that there were—[Mrs. Lund's counsel] and Mrs. Lund were in chambers with the Court on the record. I don't know what transpired, and firstly, I'm curious to see if the Court is satisfied that the funds have been transferred over to the United States. I have my doubts as to whether that will ultimately be accomplished, and I think unless it's pursued vigorously, the—we will be frustrated in our efforts, and I think the Court will.

The court responded to counsel's statement in this way:

The matter has been concluded, taken care of to the Court's satisfaction including documentary evidence of the transactions that have taken place. * * * If the matter should become of import, we'll reconsider it. As for right now, the matter is under control to the Court's satisfaction.

Still later in the trial, counsel for Mr. Lund made a more formal objection to the ex parte hearing:

[Mr. Lund's counsel]: * * * At that time, the Court went into chambers with [Mrs. Lund's attorney] and Mrs. Lund, and I believe the court reporter, and those parties were—those persons were in chambers for 10 or 15 minutes, came out, we went into trial.

At the outset of the hearing that morning, I registered what I thought was a protest to the proceedings, and I want to—so I can make the record absolutely clear before the trial is over, so I want my objection noted that I feel what happened in chambers, my being excluded was improper; that this is a contested case and a hotly contested case at that; and I had a right to be present in the court at all stages of the proceedings and to represent Mr. Lund.

The record demonstrates Mrs. Lund had expressed to the trial court her reservations about disclosing the location of her assets to Mr. Lund because she feared they might be the target of Mr. Lund's creditors. The ex parte conference was a continuation of Mrs. Lund's refusal to divulge the location of her assets to Mr. Lund. Mr. Lund's counsel voiced a vehement objection to this position and requested that the court make available to him a transcript of the ex parte hearing so he could make appropriate objections to it and, in the alternative, any suggestions to the court. Counsel for Mr. Lund further argued that the ex parte hearing denied Mr. Lund the opportunity to cross-examine Mrs. Lund or to rebut her testimony regarding marital assets.

Before this court, Mr. Lund contends that the ex parte conference deprived him of his fundamental rights in two ways. First, it allowed the court to hear evidence that could not be rebutted or challenged by Mr. Lund, denying him his constitutional rights to due process and confrontation. Second, Mr. Lund contends that the ex parte hearing prevented full disclosure of Mrs. Lund's assets, which is required in a case in which the property is to be distributed equitably. In response, Mrs. Lund argues the only protection afforded her was that she was not required to disclose the location of the account. She points out

that Mr. Lund's counsel "grilled" her over a three-day period concerning her assets and, at no time, was Mr. Lund limited in his examination concerning the nature or identity of those assets. Furthermore, she asserts that Mr. Lund's counsel could have examined her further if he had wanted to do that.

It is painfully clear that an ex parte communication of this nature cannot be ethically justified. In 1973, this court adopted the Code of Judicial Conduct in effect at the time of this trial, and it provides that a judge shall not participate in an ex parte communication concerning a pending proceeding:

(7) A judge shall accord to every person who has a legal interest in a proceeding, or that person's lawyer, the right to be heard according to law. A judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties concerning a pending or impending proceeding except that:

(a) Where circumstances require, ex parte communications for scheduling, administrative purposes or emergencies that do not deal with substantive matters or issues on the merits are authorized; provided:

(i) The judge reasonably believes that no party will gain a procedural or tactical advantage as a result of the ex parte communication; and

(ii) The judge makes provision promptly to notify all other parties of the substance of the ex parte communication and allows an opportunity to respond.

CODE OF JUDICIAL CONDUCT Canon 3B(7) (1973).

Furthermore, with respect to attorneys, the Rules of Professional Conduct for Attorneys at Law, adopted by this court in 1986, forbid them from participation in ex parte communications:

A lawyer shall not:

*      *      *      *      *      *

(b) communicate ex parte with an official acting in an adjudicative capacity concerning any substantive or procedural issue before him, or which is likely to be before him, unless:

(1) opposing counsel has consented, or

(2) such communication is otherwise permitted by law; * * *.

RULES OF PROFESSIONAL CONDUCT FOR ATTORNEYS AT LAW Rule 3.5 (1986).

In our judgment, both of these rules were applicable in this case, and both were transgressed.

In *Moore v. Moore*, 809 P.2d 261 (Wyo. 1991), we adopted a standard for determining the legal consequences of improper ex parte communications. We said there:

The rule we espouse is that, to lead to a reversal of a judgment in such an instance, a manifest injustice must appear. In order to evaluate the presence of a manifest injustice, we look to the totality of the circumstances.

*Moore*, 809 P.2d at 264.

*See O'Connor v. Leapley*, 488 N.W.2d 421 (S.D.1992). In *Moore*, in discussing the totality of the circumstances, we mentioned that: (1) the judgment was in favor of a party who was not responsible for, and who did not participate in, the ethical impropriety; (2) there was no objection to the communication by the aggrieved party during the course of the trial; (3) the record did not indicate that the judge relied upon information from the ex parte communication in arriving at his judgment; and (4) the trial judge made the fact of the ex parte contact known to the parties. In this instance, the prevailing party was involved in the ex parte communication to the exclusion of Mr. Lund and his attorney. The ex parte communication was objected to by Mr. Lund during the course of the trial, and the trial court did not divulge the content of that communication. The record does not demonstrate that the trial court relied upon any information received in the ex parte conference in deciding the case.

In this instance, at the beginning of the ex parte hearing, the court stated:

It should be noted especially that neither the defendant nor his attorney are here because the Court has agreed that these matters are confidential, at least at this point. We feel that Mrs. Lund has some legitimate reasons, at least in her mind, why she does not want word of where this money is to be made a matter of public record, so we agreed to have this conversation in chambers and confidentially.

The transcript then demonstrates the court interviewed Mrs. Lund with respect to the location of money that had been ordered by the court to be transferred back into the continental United States. After the court was satisfied that this had occurred, the following colloquy is reported:

THE WITNESS: May I say something?

THE COURT: Yes.

THE WITNESS: Okay. I appreciate very much your feelings. Not only do I appreciate your feelings, I understand them completely. I want you to know, and this Court to know that from the bottom of my soul, when this whole thing is finished, you will understand my—

THE COURT: Very well.

THE WITNESS: Thank you.

The trial judge ended the hearing after becoming satisfied the court order had been carried out. We can discern nothing in this ex parte communication that was prejudicial to Mr. Lund in any way. We also remark that the object could have been accomplished by a direction to Mrs. Lund and her attorney in open court to file a report in the record, which the court then could control by ordering it to be sealed, or by ordering counsel for Mr. Lund to not disclose the information. This ex parte hearing clearly was improper, and was not even necessary, but we do not in this instance choose to make that a ground for reversible error in the absence of prejudice to Mr. Lund. The standard of manifest injustice always assumes prejudice.

■ We are unable to fit the conference within any exception to Canon 3B(7) of the Code of Judicial Conduct, and we emphasize the impropriety of this event. After examining the transcript of the trial, as

well as the transcript of the ex parte conference, however, we are satisfied that no manifest injustice occurred in this case attributable to the ex parte communication. We do make clear that ex parte communications between the court and parties are not to be condoned, and we caution judges as well as attorneys that such meetings are highly improper; violate the canons and rules that govern our profession; and lead to a perception of favoritism that is not consistent with the practice of law or service on the bench. We are compelled to prophesy that, if this warning is not heeded, the obviously appropriate solution will be to adopt a rule that any ex parte communication between court and counsel is to be regarded as prejudicial per se and will always lead to a reversal and a new trial.

█ Furthermore, this case must be reversed because of substantive error. We have examined the order nunc pro tunc in an endeavor to ascertain the rationale behind the decision of the court not to enforce either the antenuptial agreement or the amendment thereto. Our effort to justify the trial court's decision has not succeeded.

The following findings are encompassed in the Findings of Fact:

2. One day prior to the marriage, i.e., June 5, 1981, the parties entered into an antenuptial agreement (hereinafter referred to as "Agreement") which provided in part for a distribution of marital assets upon dissolution of the marriage; the Agreement was prepared by defendant's friend and attorney, E. Belmont Herring; the agreement set forth the assets of the parties and reflected that the defendant was the party through whom the property was acquired; that the plaintiff brought very few assets, if any, into the marriage.

\*     \*     \*     \*     \*     \*

4. The Agreement provided for distribution of marital assets in the event of a dissolution of marriage and provided that certain specified property was to remain the sole and separate property of each of the parties, and that the earnings or accumulations during marriage would also be the sole and separate property of that party.

5. The Agreement further provided that plaintiff would be entitled to a portion of certain "settlement. properties" in the event of divorce. The settlement properties were defined as two items from the Schedule of Property belonging to the defendant. One property was real property designated as Item No. 28 in the above referenced Schedule of Property located in Orange County, California located at 1317 Bayside Drive, Corona del Mar, California commonly referred to by the parties as the "Bayside" property. The other property was real property designated as Item No. 37 in the defendant's Schedule of Property located in Century City, City of Los Angeles, California, and commonly referred to by the parties as the "Century Hills" property.

6. The Agreement further provided that plaintiff was to receive a fifty percent (50%) interest in the marital value of the settlement property after four years of marriage, among other terms and conditions.

7. The parties sold the settlement properties, "Century Hills" and "Bayside" prior to the dissolution of their marriage thereby rendering it impossible to satisfy the obligations of the parties under the antenuptial agreement.

8. After the separation of the parties and prior to the dissolution of their marriage, specifically on September 25, 1987, the parties signed a document entitled the "First Amendment to Antenuptial Agreement."

It is clear that the court acknowledged the existence of the antenuptial agreement and the amendment to it, but the court then did not enforce either document in deciding the case. The first conclusion of law states that Wyoming is an "equitable distribution" state, and that is followed by a brief summary of what Wyoming courts consider in order to make an equitable distribution of the property and affairs of the parties in a divorce action. Then the court continued with these Conclusions of Law:

2. Wyoming recognizes the validity of antenuptial agreements as contracts. Wyoming courts do not abuse their discretion when they distribute property in accord with an antenuptial agreement. Further property settlements are favored in Wyoming.

\*    \*    \*    \*    \*    \*

4. The consideration for the antenuptial agreement was the marriage of the plaintiff and defendant and the mutual promises contained in such Agreement. The Agreement contains no provision for amendment, alteration or substitution of the "settlement properties." The Agreement was executed upon the marriage of the parties on June 6, 1981.

5. Because the parties sold the "Settlement Properties", specifically Century Hills and Bayside, prior to the dissolution of their marriage, they thereby rendered it impossible to satisfy the obligations under the antenuptial agreement.

The court makes it clear that the ground for not enforcing the antenuptial agreement was the sale of the settlement properties prior to the dissolution of the marriage.

In addition, the court refused to consider the amended agreement in making the distribution. The Conclusions of Law in that regard state:

6. The "First Amendment to Antenuptial Agreement" did not incorporate the complete settlement of all of the affairs of the parties and the evidence failed to establish that such document was entered into with a full and complete disclosure of the nature, extent and value of the parties' properties.

7. That the "First Amendment to Antenuptial Agreement" is void and unenforceable on several separate and independent grounds as follows: \* \* \*.

The trial court went on to list several reasons for ruling that the amendment to the settlement agreement was void including: unequal bargaining power; a lack of arms-length dealing; the agreement it purported to amend lacked any provision for amendment, alteration, or substitution; and the enforcement of the amendment to the agreement would oust the court's statutory duty to make a just and equitable distribution of the property of the parties.

While the trial court clearly recognized the Wyoming rule that antenuptial agreements are valid as contracts, still it refused to enforce the agreement because the settlement properties had been disposed of, thus making it impossible to satisfy the obligations under the antenuptial agreement. It went on to rule that the First Amendment to Antenuptial Agreement was void and unenforceable on a number of grounds.

■■■ In resolving the substantive issue in this case, we must address the question of whether the trial court abused its discretion, thus committing an error of law, in arriving at an equitable division of the marital property in the face of the antenuptial agreement that had been adjusted by a later amending agreement. The applicable standard of review is governed by both a statute and precedent. The pertinent statute relating to property division provides:

In granting a divorce, the court shall make such disposition of the property of the parties as appears just and equitable, having regard for the respective merits of the parties and the condition in which they will be left by the divorce, the party through whom the property was acquired and the burdens imposed upon the property for the benefit of either party and children.

Wyo.Stat. § 20–2–114 (1987).

We have held, on numerous occasions, that the division of marital property is within the discretion of the trial court and, absent a manifest abuse of that discretion, we do not disturb that result. *Neuman v. Neuman,* 842 P.2d 575 (Wyo.1992); *Mair v. Mair,* 823 P.2d 538 (Wyo.1992) (citing *Williams v. Williams,* 817 P.2d 884 (Wyo. 1991); and *Blanchard v. Blanchard,* 770 P.2d 227 (Wyo.1989)). The trial court determines the appropriate disposition of the marital property and alimony under the statute as an exercise of its sound discretion. *Kennedy v. Kennedy,* 761 P.2d 995 (Wyo.1988) (citing *Broadhead v. Broad-*

*head,* 737 P.2d 731 (Wyo.1987)). Our rule is that an abuse of discretion occurs when the disposition shocks the conscience of the court and appears so unfair and inequitable that reasonable persons could not abide it. *Neuman; Grosskopf v. Grosskopf,* 677 P.2d 814 (Wyo.1984) (citing *Paul v. Paul,* 616 P.2d 707 (Wyo.1980), and *Kane v. Kane,* 577 P.2d 172 (Wyo.1978)). In applying these standards, we review the evidence on appeal in the favor of the successful party below, ignoring the evidence of the unsuccessful party, and granting the successful party every reasonable inference that can be drawn from the record. *Kennedy* (citing *Grosskopf* ).

■■■ Antenuptial agreements are valid and enforceable in Wyoming and "are governed by the same rules of construction as are applied to other contracts." *Laird v. Laird,* 597 P.2d 463, 468 (Wyo.1979). Under Wyoming contract law, a contract that is in writing and the language of which is clear and unambiguous requires that the intention of the parties be established from the words of the contract, considering the contract as a whole and reading each provision in light of all other provisions. *Bethurem v. Hammett,* 736 P.2d 1128 (Wyo. 1987).

■■■ An antenuptial agreement is a contract entered into between two people in contemplation and consideration of marriage. The marriage provides the requisite consideration to bind both parties. The primary purpose of such agreements is to define and fix the respective property rights of the spouses before the marriage. Challenges to such agreements generally arise upon the death of one of the parties or upon dissolution of the marriage, as in this case. Most jurisdictions now view antenuptial agreements favorably,[1] and va-

lidity usually is upheld upon this policy analysis:

> [A]ntenuptial contracts entered into between an adult husband and an adult wife in contemplation of marriage are favored by the law in that they tend to promote domestic happiness and adjust property questions which might otherwise become the source of much litigation.

Samuel Green & John V. Long, Marriage and Family Law Agreements § 2.06, at 114 (1984) (citing *Estate of Gillilan v. Estate of Gillilan,* 406 N.E.2d 981, 988 (Ind.Ct. App.1980). *See* Charles W. Gamble, *The Antenuptial Contract,* 26 U. Miami L.Rev. 692 (1972).

We are persuaded by this statement of the justification for such agreements. Mrs. Lund insisted she and Mr. Lund enter into an antenuptial agreement prior to exchanging marriage vows. Later, after the properties which were in part the subject matter of the agreement were sold, they amended their initial antenuptial agreement so it reflected a revised property settlement. In so doing, the Lunds addressed the ground the trial court espoused for not enforcing the initial contract.

■■■ It is clear that the Lunds had the foresight to agree to a property settlement prior to their marriage, before any marital discord occurred. They assumed the burden of hiring an attorney to draw up the agreement to their mutual satisfaction. After that, because of some changes in circumstances, the couple amended their agreement. The general rule is that an antenuptial agreement may be modified by further agreement of the parties after they are married, so long as the formal requisites to achieve this are followed as provided by local laws,[2] or in the agreement it-

---

1. *See* Janet Brownlee Miller, *Antenuptial Contracts to Circumvent Equitable Distribution in New Jersey Under the Revised Divorce Act,* 12 RutgersL.J. 283 (1981) (stating the view prior to 1970 was that antenuptial agreements stipulating terms regarding property settlements were almost universally considered void as against public policy and noting the current trend, which is to uphold antenuptial agreements that contemplate divorce, as long as they are fair).

2. *See* Wyo.Stat. § 1–23–105 (1988), which provides in pertinent part:

> (a) In the following cases every agreement shall be void unless such agreement, or some note or memorandum thereof be in writing,

self. 3 ALEXANDER LINDEY & LOUIS I. PAR-LEY, SEPARATION AGREEMENTS AND ANTENUP-TIAL CONTRACTS § 90.13 (1991). At a much later time, after they had separated and several lawsuits had been initiated in different states, the couple found themselves in the divorce court where the court recognized that this type of agreement generally is valid and enforceable, but not in this case. In our judgment, the policy behind such agreements was foiled in this instance.

In making what it perceived to be a just and equitable division of the marital property, the district court awarded Mrs. Lund an additional sum of $300,000 plus interest, saying, "[s]uch sum reflects the remaining unpaid balance of the $1,000,000 mentioned in the 'First Amendment to Antenuptial Agreement' which the court finds is a just and equitable division of property." It appears that, at one point, the court finds the amended agreement void for several reasons, including the fact that the court would be unable to make a just and equitable distribution of the property, but the court then refers to the amended agreement stating it finds the document to represent a just and equitable division of the property. There is an inherent, internal inconsistency. It would seem the amended agreement is either void or it is valid, but it cannot be both. We are unable, from the record, to ascertain the rationale behind the ruling of the court in deciding not to enforce either the antenuptial agreement or the amended agreement.

Mr. Lund argues the antenuptial agreement between Mr. and Mrs. Lund is clear and unambiguous and easily enforceable. Recognizing that property alluded to in the agreement has been sold, we agree it is enforceable since the evaluations for the property are subject to being established. The agreement contemplates valuation and payment to Mrs. Lund by Mr. Lund, not distribution in kind. The amendment to the antenuptial agreement provided for the

payment to Mrs. Lund of $1 million, but it did not account for the value of "Eagle's Landing" which already had been transferred to her. The trial court correctly stated that Wyoming recognizes the validity of antenuptial agreements as contracts, but the court did not enforce the antenuptial agreement or the amendment thereto. The trial court's findings of fact and conclusions of law do not demonstrate any rationale for ignoring these agreements other than the conclusion that they are unenforceable.

We hold that, in effecting a property settlement pursuant to § 20–2–114, a trial court is obligated to enforce the agreements of the parties to the marriage, particularly the antenuptial agreement, since they are entitled to that certainty. If the trial court does not enforce such agreements, a cogent rationale justifying the failure to enforce them and explaining why the court ignored such agreements must be encompassed in the record. We conclude that the disposition by the trial court manifests an abuse of discretion because it presents an error of law under the circumstances. We reverse and remand for a new trial relative to the property division, and for a determination that the property should be divided according to the parties' agreements, or an explanation as to why the agreement should not be enforced that is sufficiently explicit to permit us to review it in the light of our standards.

Because of this disposition, consideration of the propriety of the action of the trial court in denying the award of attorney fees and costs to the wife is premature. Consequently, we do not rule on that aspect of the case.

Reversed and remanded for a new trial in accordance with this opinion.

URBIGKIT, Justice, concurring in part and dissenting in part.

I concur in the decision to reverse and remand, but strenuously reject the posture

---

and subscribed by the party to be charged therewith:

\* \* \* \* \* \*

(iii) Every agreement, promise or undertaking made upon consideration of marriage,

except mutual promise to marry \* \* \*.

adopted by this court regarding code of conduct preclusions of ex parte contact between counsel and the trial court. I strongly believe, as was comprehensively considered in *Brooks v. Zebre*, 792 P.2d 196 (Wyo.1990), Urbigkit, J., dissenting, that systemic correction of ex parte contacts can more simply and decisively be achieved by reversal of each case in which it occurs.

Unless this character of conduct is to become. acceptable and generally justified by what really happens in practice, it is high time that a brightline rule be established. That rule has the epitome of significance: (a) do not do it; and (b) if you do and it involves something of real significance in the litigative process where otherwise unjustified by scheduling, etc., then summary reversal should be granted by this court. Enforcement of the prohibition would then not be left to the intangible factors involved in disciplinary proceedings, but emplaced where it occurred with adverse result in the involved litigation. *Moore v. Moore*, 809 P.2d 261 (Wyo.1991), Urbigkit, C.J., dissenting; *Brooks*, 792 P.2d 196.

If one is a practitioner of the concept now frequently heard in legislative debates about "sending a message," a brightline rule involving risk of reversal would provide an effective deterrent to this character of questionable counsel/court conduct.