**Mark SQUILLACE, Appellant (Petitioner),**

v.

**WYOMING STATE EMPLOYEES' AND OFFICIALS' GROUP INSURANCE BOARD OF ADMINISTRATION, Appellee (Respondent).**

No. 95–316.

Supreme Court of Wyoming.

Feb. 28, 1997.

Rehearing Denied March 25, 1997.

Mark Squillace, pro se.

William U. Hill, Attorney General; and Michael L. Hubbard, Deputy Attorney General, for Appellee.

Before TAYLOR, C.J., and THOMAS, MACY, GOLDEN and LEHMAN, JJ.

LEHMAN, Justice.

Appellant Mark Squillace challenges a denial of insurance benefits by Great–West Life & Annuity Insurance Company (Great–West), the entity which administers the State of Wyoming's group health insurance plan. The Wyoming State Employees' and Officials' Group Insurance Board of Administration (Board) found in favor of Great–West, and the district court affirmed the Board's decision. Appellant appeals the decision of the district court.

We affirm.

Appellant presents a single issue for review:

Whether substantial evidence in the record supports the Board and district court decisions affirming the denial of insurance benefits to the appellant.

## FACTS

Appellant is an employee of the University of Wyoming and is enrolled in the State of Wyoming's group health insurance plan with family coverage. He seeks recovery for the cost of surgery performed on his wife, Bren-

da Kelley, a covered dependent under his health insurance policy.

As a result of two cesarean sections, Ms. Kelley suffered from abdominal wall laxity. Her surgeon, ·Dr. Christopher Tsoi, diagnosed Ms. Kelley as suffering from fascial laxity and a ventral hernia. Her condition limited her ability to function, in particular, her ability to perform sit-up type motions and to lift her children. Dr. Tsoi discussed two options with Ms. Kelley: 1) no surgery, and 2) surgery to repair the abdominal wall and remove excess skin. Ms. Kelley's gynecologist, Dr. Kathryn Kohler, concurred with Dr. Tsoi in the need for repair. Dr. Kohler's letter stated that Ms. Kelley suffered from diastasis recti, a separation of the abdominal muscles, but Dr. Tsoi indicated he did not detect diastasis recti when he examined Ms. Kelley.

Appellant and Ms. Kelley decided that surgery was the best option. Several months before the surgery, appellant sought pre-authorization from Great–West for the proposed procedure. Appellant was notified on December 7, 1993, that the procedure was not covered because it was considered cosmetic. On April 5, 1994, Dr. Tsoi provided additional information to Great–West, including his medical notes from his initial consultation with Ms. Kelley. Pre-authorization was again denied, this time because the surgery was deemed not medically necessary.

According to a billing statement from Dr. Tsoi's office, on May 10, 1994, Dr. Tsoi performed surgery on Ms. Kelley, repairing an incisnal hernia and removing excess skin and subcutaneous tissue. The hospital claim was reviewed on July 8, 1994, by Great–West. The claim was denied, again on the basis that the surgery was not medically necessary.

Appellant filed a grievance with the Board seeking review of the claim. He contended that Ms. Kelley's surgery was medically necessary because it met the four criteria listed under the definition of that term contained in the policy. Even if the surgery was deemed cosmetic, appellant pointed out that the policy specifically provided for coverage of cosmetic surgery in certain circumstances. He argued Ms. Kelley's surgery was performed to correct a deformity that resulted from pregnancy, and so is a covered service under the terms of the insurance contract.

A contested case hearing was held; and, on October 13, 1994, the Board issued its findings of fact and conclusions of law in favor of Great–West. Appellant appealed to the district court, which affirmed the Board's decision on November 13, 1995. Appellant timely filed this appeal.

### STANDARD OF REVIEW

Our review of agency action is governed by W.S. 16–3–114 (1990), which provides:

The reviewing court shall:

\* \* \* \* \* \*

(ii) Hold unlawful and set aside agency action, findings and conclusions found to be:

(A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

\* \* \* \* \* \*

(E) Unsupported by substantial evidence in a case reviewed· on the record of an agency hearing provided by statute.

■ When reviewing an agency decision, we give no special deference to the district court's determination. Rather, using the same evidentiary materials and the same review standards as the district court, we conduct an independent inquiry into the matter, just as if it has proceeded directly to us from the agency. *Employment Sec. Comm'n v. Western Gas Processors, Ltd.,* 786 P.2d 866, 870 (Wyo.1990).

■ We review the entire record to determine if there is substantial evidence to support the agency's findings; and, if there is, we will not substitute our judgment for that of the agency. *Wyoming Ins. Dep't v. Avemco Ins. Co.,* 726 P.2d 507, 509 (Wyo. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it may be less than the weight of the evidence but cannot be contrary to the overwhelming weight of the evidence. *Weidner v. Life Care Centers of America,* 893 P.2d 706, 709

(Wyo.1995) (*citing City of Casper v. Dep't of Employment*, 851 P.2d 1, 3 (Wyo.1993)). The burden of proving a lack of substantial evidence is on the party appealing the agency's determination. *Devous v. State Bd. of Medical Examiners*, 845 P.2d 408, 414 (Wyo. 1993).

■ We review conclusions of law to determine whether they are in accordance with the law. *Weidner*, 893 P.2d at 710. If the conclusions are not in accordance with the law, we correct the agency's error in either stating or applying the law. *Union Pacific R.R. Co. v. State Bd. of Equalization*, 802 P.2d 856, 861 (Wyo.1990); *Employment Sec. Comm'n v. Western Gas Processors, Ltd.*, 786 P.2d at 871.

### DISCUSSION

■ This dispute centers around the health insurance policy under which appellant and his dependents are covered. An insurance policy is a contract and should be construed in accordance with general principles of contractual interpretation. *Doctors' Co. v. Ins. Corp. of America*, 864 P.2d 1018, 1023 (Wyo.1993). "Interpretation connotes consideration of the contract as a whole, reading each provision in light of all the others to find the plain and ordinary meaning of the words, as they are juxtaposed." *Martin v. Farmers Ins. Exch.*, 894 P.2d 618, 620 (Wyo.1995) (*citing Lund v. Lund*, 849 P.2d 731, 739 (Wyo.1993)). We have expressed a general reluctance to read parts of an insurance contract in isolation, as opposed to interpreting the contract as a whole to effectuate the intent of the parties. *Martin*, at 621. Here, however, the complete policy has not been included in the record on appeal, making it impossible for us to construe the contract as a whole. Accordingly, we limit our review to determining whether the Board's determinations that the surgery was 1) not medically necessary, and 2) not a covered cosmetic surgery, were supported by substantial evidence and were in accordance with law.

■ The policy lists four factors under its definition of "medically necessary." [1] The factor at issue is whether Ms. Kelley's surgery was "required for the treatment or management of a medical symptom or condition." The Board's order included the following Conclusions of Law:

2. Ms. Kelley was examined by her physician, Dr. Tsoi, in November, 1993, and was diagnosed as suffering from abdominal wall laxity. "Surgery and no surgery" were identified by her physician as two options available. No evidence was submitted to indicate that Ms. Kelley's bodily functions were impaired to the degree that surgery was needed nor was it established that she was at risk to adverse medical problems in the future if the surgery was not performed. To be considered medically necessary and covered under the plan, the service provided must be required for the treatment or management of a medical symptom. Since Brenda Kelley's physician did not indicate that the surgery was required, nor was there any evidence presented to support that it was a required surgery, the surgery did not meet the criteria for medical necessity.

\*   \*   \*   \*   \*   \*

5. The surgery performed by Dr. Tsoi repaired an incisnal hernia and removed excess skin and subcutaneous tissues.

---

1. The "General Definitions" section of the insurance policy provides:

   "**Medically Necessary**" means any services and supplies provided for the diagnosis and treatment of a specific illness, injury or condition. Such services and supplies must be:
   — ordered by a **Doctor**; and
   — required for the treatment or management of a medical symptom or condition; and
   — the most efficient and economical service which can safely be provided to such person; and

   — provided in accordance with approved and generally accepted medical or surgical practice.
   **We** may require proof in writing satisfactory to **us** that any type of treatment, service or supply received is **Medically Necessary**. Medical necessity will be determined solely by **us**. The fact that a **Doctor** may prescribe, order, recommend or approve a service does not, in itself, make such service or supply **Medically Necessary**.
   (Emphasis in original.) "**We**," "**our**" and "**us**" are defined in the policy as referencing Great–West Life & Annuity Insurance Company.

There was no repair of a ventral hernia, as had previously been diagnosed by Dr. Tsoi. Documents submitted do not show whether the incisnal hernia repair related to prior cesarean sections or whether it was created and repaired as an ordinary part of abdominoplasty. In either case, no evidence was presented to indicate it was medically necessary.

■ The Board heard testimony from the State's expert, Amy Reynolds, a Board Certified Registered Nurse with the State of Colorado. Ms. Reynolds worked in an outpatient plastic surgery clinic for three years and observed more than twenty patients who came to the clinic with varying degrees of abdominal wall laxity. Ms. Reynolds testified that in some cases surgery was not medically necessary or medically required. Only in extreme cases, where a patient may have been at risk for medical problems or was unable to perform activities of daily living (e.g., walking, eating, going to the bathroom), was surgical intervention medically required or medically necessary.

Appellant was provided ten additional days after the hearing to secure written testimony to rebut the expert's testimony, but declined to do so. Ms. Reynolds' unrebutted testimony is, therefore, a reasonable basis on which the Board could determine that medical necessity requires some risk to the patient or impairment in the functions of everyday living.

Substantial evidence on the record supports the Board's findings that Ms. Kelley was not at risk or functionally impaired to the extent that surgery was medically necessary. Appellant testified that his wife had trouble exercising and picking up their children, and complained of considerable discomfort. But he had no specific knowledge as to the extent his wife's functions were limited or the extent of pain she may have experienced. The Board also had before it statements from the three doctors at Great–West who had reviewed Ms. Kelley's records. Dr. Lenshaw stated that the fact that "no surgery" was an option and that Dr. Tsoi did not detect diastasis recti or an umbilical hernia supported his conclusion that the surgery was more for appearance than for lack of function. The record does not indicate that Dr. Tsoi or Dr. Kohler performed any tests which demonstrated the extent to which Ms. Kelley was limited.

■ With regard to cosmetic surgery, Appellant is correct in pointing out that the policy provides coverage in certain circumstances. Cosmetic surgery may be covered if the operation is performed or the treatment is rendered to correct deformities that result from illness. Illness is defined in the policy to include pregnancy. Deformity is undefined in the policy. Great–West provided a definition from Schmidt's Attorneys' Dictionary of Medicine (1988):

> **deformity.** A deviation or departure from the normal in shape, size, or proportion. A deformity may affect the body as a whole or, more often a part of it, especially a limb. Also called *malformation.*

The Board concluded:

4. No evidence was submitted to support the claim that the condition, abdominal wall laxity, is an unexpected result of pregnancy and/or a deviation from normal. Also, no evidence was submitted that showed that the degree of laxity experienced by Ms. Kelley was in excess of that normally experienced. Therefore, the surgery performed does not meet the criteria needed to be considered covered cosmetic surgery, which is, that it be performed to correct a deformity that resulted from illness.

We find it was reasonable for the Board to rely on the definition of deformity provided by Great–West. That definition was from a medical dictionary and was not controverted by appellant. Further, we find the evidence such that a reasonable mind could accept it as adequate to support the Board's findings that Ms. Kelley's condition was not a deformity.

Ms. Reynolds testified, based on her knowledge and experience and what her plastic surgeon employer had told her, that abdominal wall laxity—weakening of the connective tissue—"is a normal process in all of us." The condition is accelerated in women who bear children. Ms. Reynolds testified she would not consider the condition a de-

formity, but she did state that the condition someone suffers after a pregnancy is a deviation from what that person would normally look like if they had not been pregnant.

Dr. Tsoi's medical notes state that when Ms. Kelley attempted a sit-up motion, her muscles did not pull longitudinally, as would be expected in a normal case. He noted that the physical examination was remarkable for mid and lower abdominal wall laxity. Before and after photographs were included, showing a marked difference in Ms. Kelley's abdomen prior to and after the surgery. However, Dr. Tsoi's medical notes do not indicate that Ms. Kelley's abdominal pouching deviated from the normal in size, shape or proportion, nor does Dr. Kohler indicate that Ms. Kelley suffered a deformity. We find conflicting evidence in Dr. Tsoi's post-surgery statement that Ms. Kelley's ventral hernia and fascial laxity resulted in deformities in her abdomen.

The possibility of drawing two inconsistent conclusions from the evidence presented does not preclude an agency's conclusion from being supported by substantial evidence. *Burlington N. R.R. Co. v. Public Serv. Comm'n,* 698 P.2d 1135, 1139 (Wyo. 1985). We examine conflicting evidence to determine if the Board could reasonably have made its findings based upon all of the evidence before it. *Anschutz Corp. v. Wyoming Oil and Gas Conservation Comm'n,* 923 P.2d 751, 754 (Wyo.1996). Apparently, the hearing officer placed more weight on Dr. Tsoi's pre-surgery notes and the expert's testimony than on the post-surgery statement, which was prepared by appellant in support of this claim and signed by Dr. Tsoi. Weighing the evidence is a task assigned to the hearing officer, and we will not second guess his determinations. *Cabral v. Caspar Bldg. Sys.,* Inc., 920 P.2d 268, 271 (Wyo.1996) (*citing Latimer v. Rissler & McMurry Co.,* 902 P.2d 706, 711 (Wyo.1995)). In light of the evidence before the Board, its findings are reasonable.

### CONCLUSION

We hold that the Board's decision was supported by substantial evidence and in accordance with law.

Affirmed.

GOLDEN, Justice, dissenting.

I respectfully dissent. There is little question that an insurer is not required to pay for medical treatment simply because a treating physician has recommended the treatment. It is equally certain, however, that an insurer does not have sole discretion to decide that medical treatment obtained upon advice of a physician is not medically necessary. Upon the request of either the insurer or the insured, courts may review insurance payment decisions and the assessment procedures utilized by the insurers in making its decision. In conducting that review, courts must not add terms to a contract in order to find that substantial evidence supports the conclusions of law of a review board. In my opinion, the majority has permitted the Wyoming Employees' and Officials' Group Insurance Board (Board) to rewrite this contract. Although the entire contract is not before us, given the parties' agreement that the terms at issue are in the record, the effect of the Board's interpretation should be reviewed as explained below.

A court that decides whether or not an insurer properly denied payment for a physician-recommended course of treatment as not "medically necessary" is required to construe the term "medically necessary" in accord with the rules of contract law which apply. Many courts have attempted to define this term, some quite liberally in favor of the insured and others more restrictively. *See Kinzie v. Physician's Liability Ins. Co.,* 750 P.2d 1140, 1141–42 (Okla.App.1987) (collecting cases). In this case, the Board had the policy's definition and criteria before it and determined that one criterion used in the policy's definition of this term was not met. The second criterion listed for determining whether a procedure is "medically necessary" is whether it is "required for the treatment or management of a medical symptom or condition." In essence, the Board determined that this criterion permitted it to add the requirements that the patient show her "bodily functions were impaired to the degree that surgery was needed" and have "established that she was at risk to adverse

medical problems in the future if the surgery was not performed." This interpretation of the second criterion listed in the policy essentially defines "required" as meaning that surgery must be the only alternative or it is barred from coverage. Such an interpretation is simply an exercise in adding terms to a contract which of course is prohibited under the traditional contract law our court applies.

We have found no case law that has interpreted "required" as meaning that the insured must show medical symptoms or conditions exist to a certain degree or that the recommended treatment chosen was the only alternative. An insurer must expressly provide for these limitations in order to avoid a finding that a procedure was medically necessary. It is common knowledge that many medical conditions can be tolerated without surgery, but the question is whether a patient's choice to undergo surgery which will *cure* the impaired function and pain is medically necessary. In this case, the patient complained of pain and an impaired ability to perform normal exercise and normal lifting of her children. Her first treating physician diagnosed a ventral hernia. The patient wisely received a second opinion and received a more serious diagnosis of the cause for her impairment and pain. The majority opinion acknowledges that the treating physicians established that the medical condition and symptoms existed and were the result of two cesarean section surgeries and these serious afflictions could be *cured* by another surgery. Following the surgery, the patient was found to have suffered another kind of hernia which was repaired and apparently the surgery has successfully alleviated her medical condition. Under these facts, I believe that the terms of the insurance contract require that review be limited to the questions of whether the medical symptoms and condition existed at all and whether the chosen treatment is an accepted or established method of treatment or management. If this limitation is not applied, this particular criterion is so elastic as to be meaningless. Additionally, it leads to the result reached by the majority, *viz.*, rewriting the contract to support Ms. Reynolds' testimony although the patient and her doctors had established that surgery would treat her medical condition. It should be noted

that under my recommended analysis, Appellant was not required to rebut Ms. Reynolds' testimony. The evidence of the treating physicians and Appellant's own testimony were reasonably sufficient for the Board to properly apply this policy's criteria and determine medical necessity. There is no need to have insureds do more than what is reasonable or we risk permitting administrative review to frustrate the reasonable expectations of the insurer and the insured.

I am not suggesting that consideration of degree of impairment and future risk to adverse medical problems would never be appropriate. In fact, the third criterion, whether surgery was the most efficient and economical service which can safely be provided, would seem to require such consideration. However, the Board did not reject the claim on this basis and did not have evidence to make a comparison between the efficiency and economy of surgery as opposed to continued medical treatment. Instead, it improperly added terms to the definition of "medically necessary" under the guise of defining "required" and, as a matter of law, the Board's interpretation of the second criterion should be rejected by this Court.

Additionally, I find that the plain language of the policy permits this surgery as a covered cosmetic surgery. The Board concluded that coverage included cosmetic surgery to correct deformities that result from illness. The Board then concluded that the insured's medical condition was a deformity caused by pregnancy, which the policy defines as an illness. Although the insured had obviously met the requirements to obtain coverage, the Board went further and determined that the deformity was normal because it resulted from pregnancy. Nothing in the policy or definition of "normal" permits a denial of coverage because the deformity which has resulted from the illness is a normal occurrence. Again, this simply rewrites the contract to add an additional term and frustrates the reasonable expectations of the insurer and insured. I would reverse the Board's decision to deny payment of benefits.